[Civ. No. 51972. First Dist., Div. Four. Sept. 23, 1981.]

VOLKSWAGENWERK AKTIENGESELLSCHAFT, Petitioner, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; THOMAS F. THOMSEN et al., Real Parties in Interest.

---

COUNSEL

Jeffrey A. Little, Justs N. Karlsons and Carroll, Burdick & McDonough for Petitioners.

No appearance for Respondent.

Robert N. Stark, Hefner, Stark & Marois, C. Afton Moore III, Moore, Crawford & Stefanki and Leonard Sacks for Real Parties in Interest.

OPINION

POCHÉ, J.—Volkswagenwerk Aktiengesellschaft, a German Corporation (VWAG), properly joined as a defendant in a California action for bodily injuries and loss of consortium, petitions for mandate or prohibition to vacate discovery orders issued by respondent court which would require VWAG to permit inspection of its plant and documentary records, and to give other discovery, in Wolfsburg, West Germany. The dispositive question is whether the orders should be vacated to avoid a violation of West German judicial sovereignty. ■ This unusual and difficult issue may properly be raised by writ petition. (Cf. *Board of Dental Examiners* v. *Superior Court* (1976) 55 Cal.App.3d 811, 815 [127 Cal.Rptr. 865]; *Board of Administration* v. *Superior Court* (1975) 50 Cal.App.3d 314, 324 [123 Cal.Rptr. 530]; *Volkswagenwerk Aktiengesellschaft* v. *Superior Court* (1973) 33 Cal.App.3d 503, 508 [109 Cal.Rptr. 219]; *O'Brien* v. *Superior Court* (1965) 233 Cal.App.2d 388, 391-392 [43 Cal.Rptr. 815]; cf. also Witkin, Cal. Evidence (2d ed. 1966) §§ 1050-1051, pp. 958-961; Annot. (1964) 95 A.L.R.2d 1229, 1232-1241, as supplemented.) ■ We conclude that in the circumstances of this action the orders should be vacated.

The action arises out of a collision which occurred on October 22, 1976, when claimant Thomas Thomsen, driving a Volkswagen microbus manufactured by VWAG, struck a stopped vehicle. The front of the microbus apparently was pushed back into the driver's compartment, severely injuring Thomsen. Ultimately one of his legs was amputated. He and his wife (claimants), real parties in interest before this court, sued several defendants. Their theory against VWAG is that the microbus design was defective in that it did not provide sufficient "crashworthiness." The microbus is also known as a "type II vehicle"; VWAG has recently replaced type II vehicles in production by a newer van design called a "Vanagon."

Claimants filed suit on June 24, 1977, and added VWAG as a defendant on September 18, 1978. There have been protracted discovery proceedings, including several bitterly contested motions for discovery orders and for sanctions. In December 1979, on claimants' motion and over VWAG's objection, a single judge was assigned to preside over further proceedings in the action. The first judge assigned was Hon. Hugh S. Koford; Judge Koford was replaced in the assignment by Hon. Robert L. Bostick in November 1980.

In December 1980, claimants moved for the discovery orders here in dispute. After hearings throughout which VWAG strenuously opposed all aspects of the motion, Judge Bostick (by orders filed on Feb. 3 and Feb. 23, 1981) granted most of the relief claimants sought. In outline the orders provide:

1. *Premises.*

a. *Access*: Claimants' representatives are to have access to the VWAG facilities at Wolfsburg during normal working hours on five consecutive days to inspect and photograph the premises, inspect and copy writings, and informally interview VWAG personnel. During claimants' inspection of facilities VWAG will provide a guide. Claimants may stay after normal working hours until 10 p.m. to examine and copy writings only, and during that time VWAG may designate a monitor at claimants' expense.

b. *Inspecting and photographing premises*: Claimants' representatives may inspect and photograph VWAG's facilities, subject to relevancy limitations and to existing and future protective orders.

2. *Writings.*

a. *Access to technical library and plant and records*: Claimants' representatives shall have access to VWAG's technical library and plant and records "relating to the Type II vehicles and predecessor and successor vehicles within its type, including the currently produced Vanagon model," subject to relevancy, trade-secret, and personnel-record limitations.

b. *Inspecting and copying writings*: Claimants' representatives may inspect and copy writings "which plaintiffs shall designate as bearing upon the design, testing, modification and analysis of the crashworthiness of the front end of the Type II vehicles and predecessor and successor vehicles within its type from the outset of production through the 'Vanagon' model currently produced." The order makes procedural provisions.

3. *Informal interviews.*

Claimants' representatives may, during normal working hours, "question any of defendant's employees, not under oath, . . . to identify

persons who possess knowledge .... Such questioning shall not consist of detailed interrogation as to substantive knowledge, but be only that reasonably necessary for plaintiffs to select appropriate persons for depositions and to locate documents." Claimants must minimize inconvenience; VWAG shall "advise and request" cooperation. VWAG may have counsel present and may tape record.

### 4. *Depositions.*

Following the Wolfsburg visit, claimants shall provide a list of deponents within 45 days. Terms and procedures for depositions of deponents so listed are spelled out with specific reference to certain diplomatic communications known as "Notes Verbales," discussed below.

### 5. *Ancillary provisions.*

The orders also specify a date (since past) for the Wolfsburg visit to begin, require claimants to designate their representatives in advance, make all proceedings subject to an existing protective order, anticipate future consideration of depositions of experts, dispose of other pending issues, provide for administration of oaths, and state generally that: "The discovery procedures governing the conduct of counsel in this proceeding shall be those contained in plaintiffs' No. 1, the Notes Verbales commencing with the February 11, 1955 Note and, specifically, as set forth in the last exchange of the Notes of October 17, 1979 and February 1, 1980.[1]" Footnote 1 provides: "(1) This 'less restrictive' procedure is authorized by Article 27(b) and (c) of the Hague Convention on Taking of Evidence Abroad in Civil or Commercial Matters, ..."

By its petition to this court VWAG attacks these orders in several ways.

### California Law

■ VWAG first contends that the discovery orders are not authorized by the local law of California. Manifestly, to be enforceable outside the state a California discovery order must in the first instance comply with the California Discovery Act. VWAG makes several specific contentions; we agree with two of them.

First, the provision (contained in par. 1(d) of the Feb. 23 order) which empowers claimants to designate which of VWAG's writings

are relevant to the specified subject matter is too broad. In any event it would be necessary as a practical matter for claimants to designate the documents they wished to copy, and in light of the position which VWAG has maintained throughout this action it would be inevitable that VWAG would disagree with claimants as to the relevance of many if not all of the documents so designated. If such disagreements could not be resolved by negotiation, they should be resolved by the trial court. As drafted, the order would in effect empower *claimants* to resolve such disputes; a party to the dispute cannot be so empowered. In our view the provision would conform to the Discovery Act were the words "plaintiffs shall designate as bearing upon" deleted and the words "are relevant to" substituted.

■ Second, we find in the Discovery Act no authority for the requirement that VWAG give claimants access, during normal working hours, to its employees for the purpose of informal interviews. A party to litigation is entitled to unimpeded access to persons who may have relevant information, and may if necessary have court orders to forestall interference with such access. But these discovery orders go farther, requiring VWAG not only to permit claimants to interview its employees within its plant during working hours but also to "advise and request" that the employees cooperate with claimants. It is of course the policy of the Discovery Act that its provisions be liberally construed in favor of disclosure "unless clearly prohibited by statute or policy considerations." (*Browne* v. *Superior Court* (1979) 98 Cal.App.3d 610, 614 [159 Cal.Rptr. 669]; cf. *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 172-173 [84 Cal.Rptr. 718, 465 P.2d 854]; *Greyhound Corp.* v. *Superior Court* (1961) 56 Cal.2d 355, 372 [15 Cal.Rptr. 90, 364 P.2d 266].) But we conclude that the provision for informal interviews cannot be brought within the Discovery Act by simple construction no matter how liberal. To validate the provision we would be required to *extend* the Discovery Act beyond its statutory text, and recent cases have made clear that such an extension would be improper. (Cf. *Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 978 [140 Cal.Rptr. 669, 568 P.2d 394] (videotaping depositions); *Edmiston* v. *Superior Court* (1978) 22 Cal.3d 699, 703-704 [150 Cal.Rptr. 276, 586 P.2d 590] (videotaping of medical examination "not affirmatively authorized"); *Browne* v. *Superior Court, supra,* 98 Cal.App.3d 610, 614 (physical examination by nonphysician); *Bailey* v. *Superior Court* (1978) 79 Cal.App.3d 444, 446-448 [144 Cal.Rptr. 875] (§ 2031 "production" of a nonverbal act to be photographed).) The provision for informal interviews should be stricken from the orders in any event.

We reject the rest of VWAG's contentions under the Discovery Act.

■ VWAG argues that claimants have adequate alternative means of discovery "by established and proper procedures" and that they "have already had the benefit of pertinent discovery." Presumably this argument is addressed to the patently innovative character of the discovery orders in this action. When this question is considered without reference to whether the orders are otherwise valid the short answer appears to be that the trial court had ample cause to make the orders. It plainly appears that claimants have pursued various orthodox discovery procedures, that VWAG has consistently resisted discovery, and that the materials VWAG has produced (although apparently voluminous) have been accompanied by no assurance that they were complete or responsive. The record supports the trial court's determination that claimants needed the court's assistance and that heroic measures were called for.

VWAG also argues, more specifically, that claimants have failed to make a showing of good cause sufficient to warrant the orders for inspection of its premises and records. ■ The production and inspection procedures contemplated by Code of Civil Procedure section 2031 may be judicially enforced only upon a showing of "good cause." (Code Civ. Proc., § 2034, subd. (a).) The party required to show good cause "shall show specific facts justifying discovery and that the matter is relevant to the subject matter of the action or reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2036, subd. (a).) But "the moving party need only show, in addition to relevance (broadly construed), that his reasons for seeking discovery are within the declared purposes of the Discovery Act (that is, discovery will aid his case) and that discovery may be allowed without doing violence to equity, justice, or the inherent rights of the adversary." (Louisell & Wally, Modern Cal. Discovery (2d ed. 1972) § 6.05, p. 420; cf. also *Beesley* v. *Superior Court* (1962) 58 Cal.2d 205, 209 [23 Cal.Rptr. 390, 373 P.2d 454]; *Suezaki* v. *Superior Court* (1962) 58 Cal.2d 166, 172 [23 Cal.Rptr. 368, 373 P.2d 432, 95 A.L.R.2d 1073]; *Greyhound Corp.* v. *Superior Court, supra*, 56 Cal.2d 355, 388, 389; Louisell & Wally, *op. cit. supra*, § 6.05, pp. 424-433; *Associated Brewers Distr. Co.* v. *Superior Court* (1967) 65 Cal.2d 583, 586-587 [55 Cal.Rptr. 772, 422 P.2d 332].) "The court's determination necessarily depends on the facts and issues of the particular case." (*Associated Brewers Distr. Co.* v. *Superior Court, supra*.) In this action the trial court had access to and carefully considered the voluminous record of all proceedings to date. Such of the trial record as is before us in this

writ proceeding amply supports the trial court's conclusion that there was "good cause" in the requisite sense under sections 2031 and 2034.

■ Referring again to the provisions for inspection of premises and documents, VWAG argues that claimants have not complied with the plain requirement of section 2031 that a proponent first seek inspection by nonjudicial request. (Cf. *People* ex rel. *Dept. of Transportation* v. *Superior Court* (1976) 60 Cal.App.3d 352, 358 [131 Cal.Rptr. 476].) But so literal a reading of section 2031 would defeat the purposes of the Discovery Act in this action. It is clear that claimants have repeatedly but vainly sought production of documents sufficient to persuade them, and the trial court, that complete disclosure has been made. Claimants' motion cannot be said in these circumstances to represent an "unreasonable burden" on the trial court (cf. *People* ex rel. *Dept. of Transportation* v. *Superior Court, supra*, 60 Cal.App.3d 352, 357-358); and VWAG has had ample opportunity "to review such material and exercise available privileges or interpose other valid objections . . . ."

■ VWAG next argues in substance that the orders do not adequately describe the documents to be examined. The purpose of section 2031's requirement that documents to be inspected be adequately identified, is to protect the respondent from abuse, oppression, or other injustice. (Cf. Louisell & Wally, *op. cit. supra*, § 6.06, pp. 438-442; *Greyhound Corp.* v. *Superior Court, supra*, 56 Cal.2d 355, 394-395; *Pacific Auto. Ins. Co.* v. *Superior Court* (1969) 273 Cal.App.2d 61, 70 [77 Cal.Rptr. 836] (subpoena).) The description in these orders is undeniably broad. But we conclude that in all the circumstances reflected in the record the breadth of the description is warranted and permissible.

VWAG also argues that Judge Bostick's discovery orders "reversed, without authority," Judge Koford's prior rulings. Whether or not a prior ruling on the issues by Judge Koford would, as a matter of law, preclude the orders in dispute here, we are satisfied that the trial court's finding that Judge Koford had *not* ruled in respects here relevant is supported by the record.

*German and International Law*

■ VWAG next contends that the orders, even to the extent they would be valid under the California Discovery Act, encroach impermissibly upon the judicial sovereignty of West Germany.

█ The law of West Germany, and the terms of existing agreements between West Germany and this country, may be ascertained by judicial notice. (Evid. Code, §§ 452, subds. (c), (f), 454; cf. *Estate of Chichernea* (1967) 66 Cal.2d 83, 86, fn. 2 [57 Cal.Rptr. 135, 424 P.2d 687].) Such notice is available in the trial court and, independently, in this court (Evid. Code, § 459) which is not bound by the trial court's determination (cf. *Gallegos* v. *Union-Tribune Publishing Co.* (1961) 195 Cal.App.2d 791, 798 [16 Cal.Rptr. 185]; *Estate of Gogabashvele* (1961) 195 Cal.App.2d 503, 508 [16 Cal.Rptr. 77].) In determining foreign law by judicial notice this court can consult or use "[a]ny source of pertinent information, including the advice of persons learned in the subject matter ... whether or not furnished by a party" (Evid. Code, § 454, subd. (a)), provided that "[w]here the subject of judicial notice is the law of an organization of nations, a foreign nation, or a public entity in a foreign nation and the court resorts to the advice of persons learned in the subject matter, such advice, if not received in open court, shall be in writing." (Evid. Code, § 454, subd. (b).)

The parties have submitted substantial relevant material. From it (and from published sources which we cite below) we reach the following conclusions.

West Germany is a civil law state; apparently in common with other civil law states it takes the position that, in general, gathering of evidence within the state is exclusively the function of the state's courts and that any encroachment on this function by the courts or citizens of any foreign state may be regarded as a violation of West Germany's "judicial sovereignty." (Report of United States Delegation to Eleventh Session of Hague Conference (1969) 8 Internat. Legal Materials (U.S. Report) pp. 785, 804, 806; Edwards, *Taking of Evidence Abroad in Civil or Commercial Matters* (1969) 18 Int. & Comp. L.Q. (Edwards) pp. 618, 646, 647.) Until 1979, in general, West Germany recognized no international procedures for *production of documents* or *inspection of premises* within its territory, and suffered *testimony* to be taken within West Germany for use elsewhere, by procedures more or less comparable to common law deposition, only by application of principles of international comity to recognized categories of testimony-taking (cf. Drobnig, Bilateral Studies In Private International Law, No. 4, American-German Private International Law (1972) (Drobnig) pp. 340-341; Smit, International Co-operation in Litigation: Europe (1965) (Smit)). Depositions arranged privately, depositions on commission, and depositions on letters rogatory, all of which were tolerated subject to relatively

strict limitations. (Cf. also Note (1978) 29 Hastings L.J. 1237, 1238; *Volkswagenwerk Aktiengesellschaft* v. *Superior Court, supra,* 33 Cal. App.3d 503, 506 (hereinafter *VWAG 1973*).)

In 1979 West Germany ratified the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (23 U.S.T. 2555, T.I.A.S. 7444) which had been adopted by an international conference at The Hague in 1970 and thereafter had been ratified by several countries including the United States. This Hague Convention provides international access, by means consistent with local sovereignty, to evidence within West Germany. "One of the principal objects of a Convention on this subject is to bridge differences between common law and civil law systems." (Edwards, at p. 646.) To this end the conferees sought among other things to simplify and expedite use of "letters of request" which under the Hague Convention are considerably broader in function than letters rogatory. (U.S. Report, at p. 807.) By letter of request a "requesting authority" (here, for example, the California superior court) may transmit to a "Central Authority" in the country in which the evidence is to be taken a request for judicial assistance to be forwarded to and executed by a local "executing authority" (in West Germany, for example, the local court). Under the Hague Convention as adopted, the request can extend to testimony and to inspection of documents and property; procedures specified by the requesting authority will be applied to the extent feasible and consistent with local law; the executing authority shall apply those "measures of compulsion" which would be available in local actions; and the letter of request "shall be executed expeditiously."

Consistent with authority contained in the convention West Germany specified in connection with its ratification that "the taking of evidence by diplomatic officers or consular agents is not permissible in its territory if German nationals are involved" and that West Germany "will not, in its territory, execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries." West Germany also maintained strict control over the activities of commissioners and did not authorize consular personnel or commissioners to apply to local authorities for "appropriate assistance to obtain ... evidence by compulsion." West Germany specified other limitations and qualifications to the Hague Convention as well.

Neither the trial court nor claimants purport to proceed under the Hague Convention. Nor do the orders describe procedures which West

Germany had historically tolerated, as a matter of international comity, before 1979. Instead, claimants and the trial court rely on an exchange of diplomatic messages, called "Notes Verbales," between the United States and West Germany, citing article 27 of the Hague Convention for the proposition that "less restrictive" procedures, which claimants profess to find in the Notes Verbales, are authorized by the convention.

These Notes Verbales arose out of the postwar Allied occupation of Germany. Before World War II the evidence-taking powers of foreign consular officers within West Germany had apparently been limited to the consular compound (as distinct from "German territory" outside the consulate) and in no event extended to taking of testimony of West German nationals. In February 1955, as the Allied occupation ended, the United States High Commissioner addressed a Note Verbale to the West German Federal Ministry of Foreign Affairs asking that American consular officers in West Germany be authorized to take testimony of West German nationals; apparently the consular officers had taken voluntary depositions of all nationalities during the occupation. The upshot of a further exchange of Notes Verbales between American and West German governments, concluding on October 8, 1956, was an understanding that American consular officers could question West German and other non-American nationals, without compulsion of any kind, with an opportunity for the person questioned to be accompanied by counsel, at the consular premises or (upon the express request or express consent of the person to be questioned) at the home or place of business of the person to be questioned. Read together, these Notes Verbales represent an international understanding which will (at least as a practical matter) be honored. By a further exchange of Notes Verbales on October 17, 1979, and February 1, 1980, America and West Germany confirmed that the earlier Notes Verbales remained in effect notwithstanding ratification of the Hague Convention.

It is clear that the "questioning" contemplated by the Notes Verbales was intended to be informal and essentially investigative. Texts which refer to such questioning as "depositions" (cf., e.g., Smit, p. 202 at fn. 232; Whiteman's Digest of Internat. Law (1968) p. 223) apparently are not using the term as it would be understood under California discovery law. Because their scope is so narrow the Notes Verbales do not qualify the positions of the United States and West Germany under the Hague Convention in any relevant respect. References in the disputed discovery orders to the Notes Verbales are anomalous: In terms the Notes

Verbales do not apply to the discovery procedures described in the orders.

 We are compelled to conclude that because they conform to no West German law, treaty, or practice of which we have been made aware the discovery orders, if executed in West Germany under the authority of the respondent court, would violate West German judicial sovereignty.

## Validity of the Orders

VWAG argues that because the discovery orders would violate West German sovereignty they could not be made by a California court. VWAG relies heavily on *VWAG 1973*, in which it successfully litigated similar issues eight years ago. In *VWAG 1973* claimants Gorden sued VWAG for injuries, alleging design and manufacturing defects in a Volkswagen automobile. Gorden obtained discovery orders (1) appointing a commissioner to take depositions of VWAG employees at Wolfsburg and (2) permitting Gorden to inspect and take pictures at the VWAG plant: Sanctions were threatened should VWAG refuse to comply. VWAG, represented by the same attorneys who represent it here, had presented to the trial court a German aide memoire, an affidavit of an expert on German law, and a letter from the United States State Department, all to the effect that the orders would violate German sovereignty and international law. The orders issued. VWAG obtained a writ of mandate from the Third District Court of Appeal, which reasoned (in relevant part): "A foreign corporation's amenability to local suit does not signal automatic subjection of its internal affairs to the courts of the forum, because the latter have no jurisdiction over persons or property outside their territory. [Citation.] ... [¶] Whatever the generous provisions of the California discovery statutes, courts ordering discovery abroad must conform to the channels and procedures established by the host nation. The limitation may rest on any one of several theories—comity, curtailed discretion or implied statutory qualification. In this case the California discovery orders would impair the powers of the Federal Republic of Germany to control the property and personnel of an entity which it has created and which has never left its protection. [Citation.] Through its Embassy and through the State Department, the Federal Republic of Germany had specifically informed the superior court that letters rogatory administered by the German courts were the

appropriate vehicle for discovery. Whether the superior court's election to ignore these declarations represented an abuse of discretion or an excess of jurisdiction, it will be annulled by mandate." (*VWAG 1973*, 33 Cal.App.3d 503, 507-508.)

Our ultimate conclusion, that the discovery orders in this action should be vacated as a matter of international comity, is analogous to that reached by the *VWAG 1973* court, but we reach it by a substantially different route.

In the first place, *VWAG 1973*'s generalization that "the courts of the forum," meaning (in context) California, "have no jurisdiction over persons or property outside their territory" is far too broad. At least since *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154, 161 A.L.R. 1057], it has been clear that a corporation chartered outside a state but with sufficient business activities within the state will be subject to suit in the courts of the state. (Cf. also *Buckeye Boiler Co. v. Superior Court* (1969) 71 Cal.2d 893 [80 Cal.Rptr. 113, 458 P.2d 57].) VWAG is a party to this action, and does not contest its amenability to suit. ▮ Once a foreign corporation is properly subject to a court's jurisdiction, it (like any other party validly joined in a local lawsuit) may with technical propriety be ordered to act or to refrain from acting, in matters relevant to the lawsuit, at places outside the state. (Cf. Rest.2d Conf. of Laws, § 53; 1 Witkin, Cal. Procedure (2d ed. 1970) Jurisdiction, §§ 142-147, pp. 669-674.) In this sense, and to this extent, at least, VWAG's internal affairs *are* subject to the orders of a California court in an action to which it has been made a party. In *Coopman v. Superior Court* (1965) 237 Cal.App.2d 656 [47 Cal.Rptr. 131], on which *VWAG 1973* relies, a party sought indirectly to search the records of a Nevada corporation which was *not* a party to the action; the *Coopman* generalizations do not apply to a corporation which is properly a party to the action in which the orders issue.

It is also the general rule that the law of the forum (again, in this case, California) will govern procedural matters, including such matters of pretrial practice as "the taking and use of depositions, discovery and penalties for refusal to comply with proper request for information." (Rest.2d Conf. of Laws, § 127, com. a., subd. 5.) Further, "[i]t . . . seems that a defendant who has had sufficient contacts with the forum

state to give it personal jurisdiction can consistently with due process be required, on pain of default, to conform to that state's discovery procedures as essential incidents of the exercise of jurisdiction." (Note, *Developments in the Law—Discovery* (1961) 74 Harv.L.Rev. 940, 1050.) That VWAG should have been chartered by, and should maintain its manufacturing facility in, a jurisdiction which would regard these California discovery orders as violations of its sovereignty seems happenstance so far as the California action is concerned: A strong argument can be made that as a legitimate party to a California action VWAG may be required to elect between the demands of the California court and the sensitivities of the West German government, and to risk the sanctions authorized by California law should it elect not to give the required discovery.

On the other hand, in cases such as this American courts traditionally and properly recognize the countervailing force of international comity: The concept that the courts of one sovereign state should not, as a matter of sound international relations, require acts or forebearances within the territory, and inconsistent with the internal laws, of another sovereign state unless a careful weighing of competing interests and alternative means makes clear that the order is justified. Rulings based in this concept of international comity are dictated not by technical principles of jurisdiction of the parties to or subject-matter of particular lawsuits, but rather by exercise of judicial self-restraint in furtherance of policy considerations which transcend individual lawsuits. (Cf. Rest.2d Foreign Relations Law of the United States, §§ 39-40.) Particularized to discovery matters it is (as *VWAG 1973* recognized) "a policy of avoiding international discovery methods productive of friction with the procedures of host nations." (*VWAG 1973, supra*, 33 Cal. App.3d 503, 508.)

■ Federal cases which have dealt with procedures tantamount to international discovery have generally recognized that what is required is a case-by-case process of balancing the interests of the respective sovereignties to reach an appropriate "accommodation of the principles of the law of the forum with the concepts of due process and international comity." (Cf., e.g., *In re Westinghouse Elec. Corp. Uranium, etc.* (10th Cir. 1977) 563 F.2d 992, 996-999; *Arthur Andersen & Co.* v. *Finesilver* (10th Cir. 1976) 546 F.2d 338, 341-342.) The same federal cases also generally affirm in the first instance the jurisdictional power of federal courts to order a party *to give discovery* in another country, and gener-

ally apply the "balancing approach" only when the responding party has failed to give full discovery and seeks to avoid *sanctions* by asserting the conflict of sovereign demands upon it. (*Ibid.*; cf. also *Societe Internationale* v. *Rogers* (1958) 357 U.S. 197, 211-212 [2 L.Ed.2d 1255, 1266-1267, 78 S.Ct. 1087].)

We agree with the approach suggested in the federal cases. But we add a qualification which we deem an appropriate reconciliation of local jurisdiction and international comity: If the initial discovery order is to be validated, and if consideration of conflicts of sovereignty is to be postponed until after the responding party has failed to give the ordered discovery, then at least the initial discovery order must appear to take into account the ascertainable requirements of the foreign state and to adopt those procedures which are least likely to offend that state's sovereignty. It may be that no such accommodation is possible; if so, then arguably the order should be validated to the extent that it complies with local law, upon the assumption that the respondent party will do everything within its power to induce the foreign government to permit the discovery. But if a channel more apt to elicit the cooperation of the foreign government is plainly available but is not used, then in our view insufficient account of the requirements of international comity had been taken and the order should be set aside in the first instance.

■ Here the Hague Convention provides an obvious and preferable alternative means of obtaining evidence from within West Germany. Claimants argue that the convention is too restrictive to be of practical benefit. They are concerned particularly that the Convention mandates use of letters rogatory which (as visualized by claimants) would bind them to written interrogatories. We believe claimants read the Hague Convention too narrowly: The convention expressly contemplates that the German courts should seek in good faith to implement any legitimate discovery procedure the California court may request. It is true that by the terms of its ratification West Germany has indicated that it will not execute letters of request for pretrial discovery of documents, but we suggest that this limitation should be tested, in this action, by a specific request that West Germany permit inspection of documents in light of the manifest need for full disclosure of evidence in the pending California action. In our view an order drafted to employ the discovery means least likely to antagonize the foreign government may also properly require the responding party to take all possible steps to secure the permission and cooperation of the foreign government. We have no doubt that VWAG has the attention and respect of the West German

government and that a request from VWAG to suffer discovery to proceed in substantial conformity with California law would be favorably received.

Federal cases also suggest that concerns of international comity such as those which motivate us here should be considered only if such concerns have been brought to the court's attention, through diplomatic channels, with direct reference to the orders in question. (Cf., e.g., *American Industrial Contr., Inc.* v. *Johns-Manville Corp.* (W.D.Pa. 1971) 326 F.Supp. 879, 880-881; *Arthur Andersen & Co.* v. *Finesilver, supra*, 546 F.2d 338, 342.) In *VWAG 1973*, a West German aide memoire and a State Department letter were forwarded to the court; in this action, although counsel for VWAG represented at oral argument that an aide memoire had been issued, we have received no diplomatic communication. Nevertheless we are satisfied that West Germany would, were the matter brought to its attention, deem the discovery orders a violation of its judicial sovereignty. We perceive no need to wait for an aide memoire.

Once again we stress that we do not question the jurisdiction of the trial court to order VWAG, as a party to the lawsuit before it, to give discovery in West Germany. With the qualifications we have stated under California law, the orders are appropriate to the action and VWAG is legitimately subject to the orders. We conclude only that the trial court, in the exercise of judicial restraint based on international comity, should have declined to proceed other than under the Hague Convention at this stage.

We regard our conclusion as an exercise of judicial self-restraint designed to serve what we regard as important international goals. We could perhaps read the Hague Convention, broadly, as a preemptive and exclusive rule of international evidence-gathering, binding upon us as the supreme law of the land under clause 2 of article VI of the federal Constitution. But we prefer to believe that the Hague Convention establishes not a fixed rule but rather a minimum measure of international cooperation; our reading of article 27 of the convention encourages us to conclude that this is, indeed, what the ratifying states intend.

Let a writ of mandate issue directing the trial court to set aside its discovery orders of February 3 and February 23, 1981, without preju-

dice to renewed application for discovery orders procedurally consistent with the views expressed in this opinion.

Rattigan, Acting P. J., and Christian, J., concurred.

The petition of real parties in interest for a hearing by the Supreme Court was denied January 20, 1982. Broussard, J., did not participate therein.