[No. A093974. First Dist., Div. Three. Dec. 17, 2002.]

AMERICAN HOME ASSURANCE COMPANY et al., Plaintiffs and Respondents, v.
SOCIÉTÉ COMMERCIALE TOUTÉLECTRIC, Defendant and Appellant.

**COUNSEL**

Thelen Reid & Priest, Curtis A. Cole, Richard A. Lapping, Torgny Nilsson, Aaron Danzer and Eumi Lee for Defendant and Appellant.

Hellring Lindeman Goldstein & Siegal, Stephen L. Dreyfuss and John A. Adler for French-American Chamber of Commerce in the United States, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Lewis D'Amato Brisbois & Bisgaard, David E. Reynolds and Kenneth D. Watnick for Plaintiffs and Respondents.

**OPINION**

**PARRILLI, J.**—In *Société Nat. Ind. Aéro. v. U. S. Dist. Court* (1987) 482 U.S. 522 [107 S.Ct. 2542, 96 L.Ed.2d 461] (*Aérospatiale*), the United States

Supreme Court rejected the idea that discovery in a foreign country subscribing to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the Hague Convention) must first proceed under the Hague Convention before discovery is attempted under federal rules. The court deemed such a requirement both unwise and inconsistent with the text of the Hague Convention. (*Id.* at pp. 542-543 [107 S.Ct. at pp. 2554-2555].) It held that the interests of international comity demanded a "more particularized analysis" involving "prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to [Hague Convention] procedures will prove effective." (*Id.* at p. 544 [107 S.Ct. at p. 2556].)

We hold that the rule of first resort to the Hague Convention announced in *Volkswagenwerk Aktiengesellschaft v. Superior Court* (1981) 123 Cal.App.3d 840, 858 [176 Cal.Rptr. 874] (*Volkswagenwerk*) has been superseded by the balancing test provided in *Aérospatiale*. We also conclude that the *Aérospatiale* court's interpretation of the Hague Convention has nullified the holding of *Pierburg GmbH & Co. KG v. Superior Court* (1982) 137 Cal.App.3d 238, 244 [186 Cal.Rptr. 876] (*Pierburg*) that a litigant cannot waive the requirement of first resort by failing to demand compliance with the Hague Convention. In this case, the tactics of the party responding to discovery were so inconsistent with Hague Convention procedures that the trial court properly found the party had waived the right to insist on those procedures.

Société Commerciale Toutélectric, a French corporation, appeals from a default judgment requiring it to pay $25,343,720.58 to the American Home Assurance Company and AIU Insurance Company (collectively American Home). The court entered Toutélectric's default after striking its answer to American Home's complaint, as a discovery sanction for Toutélectric's failure to produce three witnesses for deposition. Toutélectric contends the court erred by refusing to apply Hague Convention discovery procedures. We affirm the judgment.

BACKGROUND

1. *The Complaint*

The first amended complaint alleged the following scenario: Electric Engineering Company (EEC), a Florida corporation wholly owned by Toutélectric, obtained payment and performance bonds from American Home in connection with a contract providing for EEC to construct a power plant in California. Toutélectric guaranteed EEC's obligations on the bonds. When EEC and Toutélectric realized that EEC was not going to be able to complete the construction project, they developed a strategy to shift their

liability to American Home. Without informing American Home of the problems with the project, they asked it to issue security riders that would raise the amount of the bonds. American Home did so, increasing its exposure to $2,543,800.

When EEC was declared in default and terminated from the project, it misled American Home about the merits of the claims against EEC by subcontractors and suppliers, and about its defenses to those claims. EEC filed suit against American Home, among others, taking the position that American Home had no obligation to complete the project or pay the obligees on the bonds. EEC and Toutélectric then conspired with various lawyers, who represented both American Home and EEC despite the parties' conflict of interest, in an extended effort to avoid indemnifying American Home. American Home was persuaded to take over EEC's claims against the bond obligees, after EEC dropped its lawsuit. American Home filed its own declaratory relief action, which was transferred to bankruptcy court.

A subcontractor filed a lawsuit known as the *Valley Engineers* action against EEC and American Home in Yuba County Superior Court. EEC removed that case to federal district court. The lawyers representing EEC and American Home persistently acted against American Home's interests in this litigation, concealing relevant information from American Home, refusing to produce documents during discovery, and unsuccessfully attempting to conceal damaging information by inking out portions of notes of a key meeting. As a result of this suppression of evidence, American Home's answer and defenses were stricken, and the *Valley Engineers* case went to trial on damages alone. Faced with the prospect of consequential and punitive damages as a result of the fraudulent conduct of its attorneys, orchestrated by EEC and Toutélectric, American Home settled the case for an amount substantially exceeding its obligations under the payment and performance bonds.

In October 1996, American Home served Toutélectric with the first amended complaint, in accordance with the service requirements of the Hague Convention. In December 1997, the trial court denied Toutélectric's motion to quash for lack of personal jurisdiction. Writ petitions to this court and the California Supreme Court were denied in February and April 1998. The United States Supreme Court denied certiorari in June 1998.

2. *The Discovery Proceedings*

While Toutélectric was still contesting the trial court's jurisdiction, the court directed American Home, EEC, and Francis Royer, an individual

defendant and officer of EEC and Toutélectric, to brief the issue of whether the Hague Convention governed discovery propounded to Royer. American Home relied on *Aérospatiale, supra,* 482 U.S. 522, for the proposition that Hague Convention procedures are merely optional. It contended Royer had not met his burden of showing that discovery under the Hague Convention would be effective, noting his claim that France had exercised its right under the Hague Convention to bar the production of documents in discovery. American Home claimed its ability to depose Royer would be severely restricted under the Hague Convention, because Royer could refuse to attend, a diplomatic officer rather than counsel would ask the questions, and no follow-up questioning would be permitted. American Home also argued that the Hague Convention, which required the involvement of the French government in the discovery process, would create substantial delays.

In their initial briefing, EEC and Royer argued that *Volkswagenwerk, supra,* 123 Cal.App.3d 840, required first resort to the Hague Convention. However, in response to American Home's brief, EEC and Royer conceded that *Aérospatiale* was controlling, and "[t]here is no automatic blanket rule that the Hague [Convention] should, or should not apply." They claimed the balancing of interests contemplated in *Aérospatiale* favored application of the Hague Convention. While document requests were not permitted, they noted that requests for admission were allowed, and asserted that many of the documents sought by American Home could be obtained elsewhere. Regarding depositions, they stated: "All that is required of Plaintiffs is careful drafting of their required questions for submission to Mr. Royer."

At a hearing on the matter in December 1997, counsel for EEC and Royer said she now believed French law permitted "very specific" document requests, although she was not certain. She was trying to get authority from a French attorney on this point. The court applied the *Aérospatiale* test, and decided the sovereign interests of the United States and France concerning discovery were "a wash." Royer had repeatedly participated in discovery "when to do so was productive to his interest," noted the court. While the court believed the Hague Convention might or might not prove an effective means of discovery, it anticipated frequent discovery disputes based on the parties' behavior to date, and deemed the Hague Convention procedures "cumbersome." The court concluded that California discovery procedures would apply, but with court supervision to prevent discovery from becoming "broad and abusive." It ordered American Home to translate its discovery requests into French.

The court decided its ruling on the Hague Convention would not apply to Toutélectric, which had yet to appear in the case. However, the court

commented: "Anybody have a pretty good idea as to what I'm going to do with Toutélectric? But of course there may be other concepts that you will call to my attention."

American Home served Toutélectric with a first request for production of documents in July 1998. Toutélectric objected that the request exposed it to criminal and civil sanctions under French law, and stated that France had not adopted the Hague Convention provisions permitting the service of document production requests. Evidently the court overruled the Hague Convention objections in an unreported telephone conference hearing, and found that the sanctions contemplated by French law were limited to documents containing financial, technical, or trade secret information. On September 4, 1998, Toutélectric produced six pages of documents.

On September 3, 1998, Toutélectric's counsel faxed a letter to the discovery referee regarding the deposition of Francis Royer. Counsel expressed concern about the manner in which the deposition would proceed, because it "may serve to set a precedent for the later depositions of employees of [Toutélectric]." Counsel stated that French law required Royer's deposition to be taken pursuant to the Hague Convention. He argued that *Aérospatiale*, *Volkswagenwerk*, and *Pierburg* all supported application of the Hague Convention, and noted that *Volkswagenwerk* and *Pierburg* had not been expressly overruled. Counsel asked the referee to order that the Convention would govern the depositions of all French resident defendants and their employees. Otherwise, counsel said he would seek an expedited telephone conference with the trial court.

Counsel did not bring his objections to the court, however. On September 12, 1998, he appeared for Royer's deposition, representing both Royer and Toutélectric. Counsel for EEC, who had previously represented Royer, also attended the deposition. Hague Convention procedures were not followed, and the deposition went on for four or five days. At the deposition, the referee ordered American Home to translate the request for production of documents for the benefit of Toutélectric's employees. On October 20, Toutélectric served a supplemental response restating its objections and responding individually to each request by claiming that "French law does not permit the public release of private business information in litigation." It provided no further documents. On November 2, the discovery referee ordered Toutélectric to produce all nonprivileged documents as required by the Code of Civil Procedure.

In November 1998 Toutélectric moved for an emergency protective order, arguing it was unable to produce documents under a French statute known as

the Law of 1980. Toutélectric explained that this law prohibited the production of "economical, commercial or technical documents" outside of the Hague Convention, that other kinds of documents could only be produced through the discovery methods provided in the Convention, and that violation of these requirements was subject to criminal penalties. At the hearing on the motion, Toutélectric's counsel stated that financial documents other than those publicly released in France were simply "not producible." He offered to make the publicly released documents available to American Home in France. The court declined to rule on the motion for a protective order, instead instructing the parties to "make your best efforts." The court anticipated that Toutélectric's claims would come before it if Toutélectric were sanctioned by the referee for discovery violations.

In December 1998, the parties participated in a hearing by conference call with the referee. Toutélectric's counsel confessed that he had been mistaken when he said that public documents would be made available in France. The French government had informed him that he could not comply with American Home's request for documents. Thus, according to counsel, it was not a matter of compliance with the Hague Convention. Toutélectric was simply unable to produce the documents. Counsel suggested that American Home might submit its request directly to the French Ministry of Justice, without going through Hague Convention protocols, and the Ministry would determine what Toutélectric could produce. In closing, counsel stated he was not arguing that American Home was required to abide by French law in seeking documents, or that the court was required to order the parties to follow the Hague Convention. He argued only that Toutélectric's failure to provide discovery was not willful, which was a factor that should mitigate any sanction imposed by the court. The referee took the matter under submission.

Later in December 1998, American Home noticed the continued deposition of Francis Royer, and the depositions of Genevieve Royer, Pierre Royer, and Jacques Massat, to begin January 11, 1999. Genevieve Royer was the wife of Francis Royer. Pierre Royer and Jacques Massat were officers of Toutélectric.

On January 5, 1999, the referee issued a recommended ruling denying Toutélectric's request for a protective order. The referee rejected Toutélectric's objections based on the Law of 1980 and the Hague Convention, and recommended that the court strike Toutélectric's answer if it did not comply in full with American Home's document request within seven days. The next day, counsel for American Home sent a letter to Toutélectric's counsel memorializing conversations in which Toutélectric had been unable to confirm that its clients would appear for the noticed depositions. Counsel for

both sides agreed that depositions should not proceed until there was a resolution of the referee's recommendation that Toutélectric's answer be stricken.

Toutélectric produced no documents. At a hearing on January 29, 1999, the trial court was reluctant to impose terminating sanctions. Toutélectric's counsel apologetically told the court he had been mistaken at the last hearing when he said documents would be provided in France. Counsel again suggested that American Home could write the French Ministry of Justice and seek a ruling on what Toutélectric could produce. The court ignored this suggestion, and advised Toutélectric that if it failed to produce documents, it would be precluded from disputing any issues related to those documents. Toutélectric's counsel did not mention the Hague Convention.

Regarding the depositions, Toutélectric's counsel said he did not yet know whether Pierre Royer or Jacques Massat would appear, though he said, "I have been told prior to this that they would appear in the depositions." He noted that French law prohibited employers from compelling employees to appear for deposition. He had no reason to believe Francis Royer would not complete his deposition, but Genevieve Royer was under a doctor's orders not to be deposed. Again, counsel did not mention the Hague Convention. American Home's counsel was willing to go to France for the depositions, but expressed some concern over letters from the French government produced by Toutélectric, which suggested that conducting discovery in violation of French law would expose counsel to prosecution. The court responded that this problem could be avoided by conducting the depositions at the American Embassy.

At a hearing in March 1999, Toutélectric's counsel told the court that after conferring with his clients and their French counsel, he would be able to compile and provide certified financial documents that were a matter of public record in France, as well as financial documents that had already been made public in other litigation. However, confidential communications with French counsel and internal financial documents could not be produced. The court asked counsel to provide the referee with a log of all documents claimed to fall under the attorney-client privilege. Counsel said he would have to ask for advice on whether he could do that. The court decided to wait until after the public financial documents were released to see whether there was a need for further discovery of internal documents. American Home's counsel pointed out that some internal documents had been chosen by Toutélectric for use in support of its motion to quash. Toutélectric's counsel explained that French law permitted his client to voluntarily disclose documents outside of discovery, but not to be compelled to disclose anything outside of the Hague Convention.

Regarding depositions, Toutélectric's counsel stated that Francis and Pierre Royer and Jacques Massat would appear, but he asked the court to order the depositions to be taken at the American Embassy in order to avoid French jurisdiction. He also asked for a protective order precluding the deposition of Genevieve Royer, and said he would provide letters from her doctors. The court was amenable to these arrangements.

At a hearing in April 1999, Toutélectric informed the court that it had produced 2,800 pages of documents that were in the public domain. Toutélectric's counsel declared that other financial documents simply could not be produced "in response to discovery, regardless of the situation." Counsel reaffirmed his understanding that Toutélectric could provide documents voluntarily to assist in its defense, but could not be compelled to produce those documents through discovery. The court again warned Toutélectric that it could be barred from producing any evidence on certain issues if it failed to comply with discovery.

At the April hearing, the parties also discussed a request for assistance from the court to the French Ministry of Justice, regarding the depositions of Francis Royer, Pierre Royer, Genevieve Royer, and Jacques Massat. After making certain modifications in the request at Toutélectric's behest, the court signed the document, which stated the depositions would be taken "in accordance with the laws of the State of California." The request contemplated that depositions would take place "as soon as reasonably practicable, hopefully" by June 15, 1999. Toutélectric's counsel confirmed that this arrangement was acceptable to his client.

On May 3, 1999, Toutélectric filed a supplemental response to the request for production of documents, reasserting its claim that the French Law of 1980 prohibited the production of some documents. On May 15, Toutélectric filed a "privilege log" consisting of a single page listing general categories of documents.

On May 24, 1999, American Home noticed the depositions of Francis Royer, Pierre Royer, Genevieve Royer, and Jacques Massat beginning June 21, 1999 at the American Embassy in Paris. On June 4, the French Ministry of Justice wrote the trial court, stating that the discovery referee was authorized to take the depositions of the Royers and Massat pursuant to and in accordance with the Hague Convention. Also on June 4, the trial court disclosed that an insurer in the same group of companies as American Home had undertaken the defense of the San Francisco Superior Court and its judges in a federal lawsuit. On June 15, the court stayed all discovery in

American Home's case due to conflict of interest objections raised by Toutélectric. The next day, American Home notified the embassy in Paris that the depositions scheduled for June 21 would not proceed due to the stay.

On June 17, 1999, the French Ministry of Justice sent another letter to the trial court, stating that a representative of one of the defendants had informed the ministry that the discovery referee had "supposedly declined" to serve at the depositions, and that some of the involved persons may not have been summoned in the manner specified by French law. The Ministry asked for confirmation whether the referee's assignment would be maintained and for copies of the summons served on the deponents. Also on June 17, American Home filed a motion to compel Toutélectric to provide a privilege log specifically identifying documents withheld on a claim of privilege. American Home sought sanctions for Toutélectric's failure to produce all responsive nonprivileged documents.

On June 23, 1999, Toutélectric filed a motion to disqualify the trial court. On June 25, the motion was denied. On July 28, the court lifted the discovery stay, directing that "all discovery in this action shall proceed in accordance with the recommendations of the Discovery Referee."

The parties returned to the subject of depositions at a hearing in January 2000. The court told American Home to renotice the depositions. American Home's counsel said he would prefer the deponents come to California, at American Home's expense. Toutélectric's counsel said the deponents would not come. The parties agreed to hold the depositions in France. The court told American Home to notice the depositions, and any objections would be handled on a motion to compel or for a protective order.

At a hearing in February 2000, Toutélectric's counsel expressed optimism that counsel could work out a deposition schedule amongst themselves. American Home's counsel asked for a ruling on its July 17, 1999 motion for a specific privilege log and for sanctions. The court ordered counsel to refile, with separate motions for sanctions and for the privilege log. American Home filed its motions on March 1.

On March 16, 2000, Toutélectric's counsel informed his counterpart that Pierre and Francis Moyer and Jacques Massat, on the advice of French counsel, would only appear for deposition at the American Embassy in Paris and in accordance with the Hague Convention. Genevieve Royer was "medically unable" to undergo deposition.

On March 22, 2000, Toutélectric filed its opposition to the sanctions motion. Toutélectric argued it was unable to produce further documents

under the Law of 1980, unless American Home proceeded under the Hague Convention. It attached letters it had received from the French Ministry of Justice in October and November of 1998, stating that no exemption could be allowed for the bar against disclosure of economic or commercial documents, but that the prohibition might be lifted if a request were made in accord with the Hague Convention. Toutélectric contended first resort to the Hague Convention was required under *Volkswagenwerk* and *Pierburg.*

American Home filed a reply brief contending (1) Toutélectric was estopped from relying on the Hague Convention because it had not challenged the court's rejection of the Hague argument in the hearing by teleconference in September 1998; (2) in any event, *Volkswagenwerk* and *Pierburg* had been superseded by *Aérospatiale;* and (3) it would be unfair to require American Home to conduct discovery through the Hague Convention, when Toutélectric had been freely pursuing discovery from American Home under California law.

On March 29, 2000, in response to an inquiry from American Home regarding the scheduling of depositions in Paris, Toutélectric stated that American Home was required to proceed under the Hague Convention. It suggested waiting until the court ruled on Toutélectric's Hague Convention arguments at the sanctions hearing.

At the hearing on March 31, 2000, the court rejected Toutélectric's claims under the Hague Convention for three reasons: (1) the Hague Convention was not a mandatory first step, for the reasons stated in American Home's reply brief; (2) Toutélectric had waived the protection of French law by producing the financial records it had already provided; and (3) Toutélectric's view that it was entitled to voluntarily produce whatever records it wished to use in its defense, but not be compelled to produce other records, "can't possibly be acceptable to an American court." The court observed that Toutélectric had already violated the Law of 1980 by producing documents outside the Hague Convention. It told Toutélectric it was going to have to choose whether to produce the requested financial information or face issue preclusion sanctions, and gave Toutélectric until April 27 to produce the documents.

Regarding the depositions, Toutélectric denied insisting on the Hague Convention procedure, though it said it did believe that procedure was required and would be seeking relief in the Court of Appeal from the trial court's ruling. Toutélectric claimed that all it was asking was "we need to apply to the American Embassy to do it, just like we did last time and we'll

do everything we can to assist you in reapplying and going forward." However, Toutélectric also informed the court that the referee was "out of the case, he's expressed to me that he doesn't want anything to do with the case. We don't want to pay him to be in the case." On May 1, 2000, Toutélectric filed a writ petition seeking relief from the court's ruling that the Hague Convention did not apply to the document request.

At a hearing on May 12, 2000, Toutélectric confirmed that it had not and would not produce any more documents. It claimed it wanted to produce the documents sought by American Home, but could not unless the request was made through the Hague Convention. Observing that Toutélectric had repeatedly told the court it could voluntarily provide any documents, the court invited Toutélectric to bring the documents to court and file them as exhibits, not in response to any discovery request. Toutélectric's counsel suggested he had not clearly understood French law, and said the documents could only be provided under Hague Convention procedures.

The court inquired as to exactly what was required under the Hague Convention. Counsel for Toutélectric was unsure, but believed the document request would be translated into French and submitted to the Ministry of Justice, which would review the request and decide whether to allow production. Counsel for American Home agreed with this general description of the procedure. Toutélectric's counsel pointed out that if the Hague Convention procedure did not result in sufficient discovery, California law and sanctions would then properly apply. The court declined to revisit its Hague Convention ruling, and asked for briefing on issue preclusion sanctions.

On June 12, 2000, the court sanctioned Toutélectric for its failure to produce documents. The court reviewed the discovery proceedings, and noted that Toutélectric had failed to provide the court with a clear enough explanation of the applicable French law to provide legitimate grounds for a protective order. The court barred Toutélectric from presenting evidence of its financial records at trial.

On June 29, 2000, this court summarily denied Toutélectric's writ petition.

On July 13, 2000, American Home noticed the depositions of Francis Royer, Pierre Royer, Genevieve Royer, and Jacques Massat, to be taken at the American Embassy in Paris beginning August 14.

On July 24, 2000, Toutélectric filed a writ petition challenging the trial court's sanctions order, and asking this court to prohibit the imposition of

sanctions without first resort to Hague Convention procedures. We denied the petition on July 27, noting the issues raised by Toutélectric had already been considered in connection with our June 29 ruling. On August 3, Toutélectric filed a petition for Supreme Court review of our July 27 ruling. Our Supreme Court denied this petition on September 20, 2000.

Meanwhile, on July 26, 2000, Toutélectric moved for a protective order to prevent the deposition of Genevieve Royer, claiming she was "physically unable to be subjected to oral examination."

On August 1, American Home's counsel wrote the American Embassy in Paris, requesting assistance in scheduling depositions during the week of August 14. On August 3, the embassy replied that no space was available before October, due to repair work. It advised American Home that the French Ministry of Justice usually authorized depositions to be taken outside the embassy in such circumstances. American Home postponed the depositions.

At a hearing on August 18, 2000, the court denied the motion for a protective order for Genevieve Royer, because Toutélectric had failed to provide competent evidence supporting a medical excuse. The parties discussed the French depositions, and whether the September 25 trial date would have to be postponed. The court advised American Home to seek the embassy's assistance in finding an alternate site for the depositions. The court deferred making a decision on the trial date.

On August 21, 2000, American Home faxed the embassy a request for advice and assistance with the depositions. The embassy replied the next day that it would forward a letter to the Ministry of Justice, with a cover letter of its own explaining why the embassy was unavailable. However, since it would take least two or three weeks to get a response, the embassy suggested simply going ahead with the depositions in a hotel without the ministry's authorization, if the witnesses were willing to appear. "We do not officially recommend it but sometimes there is no other option and even the people at the ministry know it." In this case, since a referee had been commissioned to "take the depositions and administer the oath, it should be fine." American Home replied that the parties had agreed the referee's attendance was not necessary. It asked again for the embassy's assistance. The embassy responded that it could only be involved if "a consular officer is commissioned by the court." American Home forwarded a copy of this reply to Toutélectric, and asked whether it would prefer to seek the referee's attendance, to proceed at a hotel in Paris without the referee, or to produce its witnesses

somewhere else, such as New York. Toutélectric's counsel replied that his clients were no longer willing to pay for the referee's fees, and said he would ask them about alternative locations.

At a status conference on September 7, 2000, Toutélectric's counsel told the court that American Home had failed to notice depositions at any alternate location after finding the embassy was unavailable. Counsel affirmed that "[t]hey've asked us will our clients appear at different places, we've said they will not." The court asked if the embassy's unavailability meant that his clients should not be deposed, and counsel said "[a]bsolutely not." He proposed scheduling the depositions for as soon as the embassy opened in October. American Home's counsel said he would do what he could to accommodate that request, but anticipated that Toutélectric would object on the ground that no judicial officer was commissioned to preside over the depositions. The court, after ascertaining that Genevieve Royer was no longer an employee of Toutélectric, ordered Toutélectric to produce Pierre and Francis Royer and Jacques Massat for deposition either in France or in the United States. Toutélectric's counsel said it wouldn't matter whether the deponents were ordered to appear in New York or Atlanta.

As the court began discussing the trial date, Toutélectric's counsel asked the court for enough time to ensure the deponents could be served as required by the Hague Convention. The court denied the request, saying "we've been through that. You've waived it. And it doesn't apply." Toutélectric's counsel asked what the harm would be in complying with the Hague Convention. The court stated, "[I]n my judgment the procedures required to comply with the Hague Convention are unduly cumbersome and prejudicial to the plaintiffs being able to get the information they're entitled to. I will not explain that further. . . . [¶] Not only that, as I said, your clients have repeatedly, when it was to their advantage, provided information to this Court and other courts I've been told, but certainly to me, which in my judgment would be in violation of the laws that they're complaining about. Therefore they have waived the arguments." The court also noted *Aérospatiale*'s holding that Hague Convention procedures are not mandatory. The court postponed the trial date to December 1.

The next day, September 8, American Home's counsel wrote the embassy asking if it would be available for depositions during the first two weeks of October. The embassy responded that it would be available, if American Home had received approval from the Ministry of Justice, and "assuming that the deposition will be conducted under the terms of the Hague Convention." American Home replied that the court had ruled out the Hague

Convention, and asked whether the embassy would be available under these circumstances. On September 25, American Home wrote Toutélectric, informing it that the embassy was apparently not available, and asking where the Royers and Massat would be produced for deposition. On October 3, 13, 18, and 19, American Home repeated its inquiry as to the availability of these witnesses for deposition. On October 18, Toutélectric's counsel advised that he was waiting for word from his clients regarding their depositions. On November 13, Toutélectric informed American Home that Francis Royer was available for deposition in Paris "at a mutually convenient time and place," but that Pierre Royer and Jacques Massat would not appear for their depositions.

On November 16, 2000, American Home moved for terminating sanctions against Toutélectric due to its failure to comply with the order requiring it to produce the Royers and Massat for deposition. Toutélectric responded by reaffirming its reliance on the Hague Convention. At the hearing on the motion, Toutélectric informed the court that French counsel had advised all three witnesses not to appear, because they would be violating the Law of 1980 if the Hague Convention were not followed. Francis Royer, however, after "a good bit of discussion," decided that he could and would appear for deposition. Counsel explained that he had not meant to promise during the last hearing that his witnesses would appear in Atlanta or New York.

The court ruled that Toutélectric, but not its counsel, had willfully disregarded the order to produce witnesses for deposition. The court found that each of the three witnesses had personal, material knowledge of facts central to American Home's case. The court concluded that Toutélectric's failure to produce these witnesses, coupled with its earlier failure to produce financial records, "demonstrate[d] a persistent, willful and unjustified refusal by Toutélectric to comply with its legitimate discovery obligations in this case." Issue sanctions would only further Toutélectric's scheme to withhold evidence, reasoned the court. Therefore, the court struck Toutélectric's answer, entered its default, and subsequently entered a default judgment.

Toutélectric moved for a new trial, arguing that compliance with the Hague Convention was required by California law, and that the terminating sanction imposed by the court was unduly severe. The motion was denied.

### DISCUSSION

1. *Aérospatiale Has Superseded the Rule of First Resort to the Hague Convention*

■ Toutélectric relies on the "rule of first resort" developed in *Volkswagenwerk, supra*, 123 Cal.App.3d 840. The French-American Chamber of

Commerce in the United States, Inc., has filed a brief as amicus curiae, urging us to reaffirm the holding in *Volkswagenwerk*. In that case, Division Four of this district discussed the comity analysis governing international discovery as follows:

"Federal cases which have dealt with procedures tantamount to international discovery have generally recognized that what is required is a case-by-case process of balancing the interests of the respective sovereignties to reach an appropriate 'accommodation of the principles of the law of the forum with the concepts of due process and international comity.' [Citations.] The same federal cases also generally affirm in the first instance the jurisdictional power of federal courts to order a party *to give discovery* in another country, and generally apply the 'balancing approach' only when the responding party has failed to give full discovery and seeks to avoid *sanctions* by asserting the conflict of sovereign demands upon it. [Citations.]

"We agree with the approach suggested in the federal cases. But we add a qualification which we deem an appropriate reconciliation of local jurisdiction and international comity: If the initial discovery order is to be validated, and if consideration of conflicts of sovereignty is to be postponed until after the responding party has failed to give the ordered discovery, then at least the initial discovery order must appear to take into account the ascertainable requirements of the foreign state and to adopt those procedures which are least likely to offend that state's sovereignty. It may be that no such accommodation is possible; if so, then arguably the order should be validated to the extent that it complies with local law, upon the assumption that the respondent party will do everything within its power to induce the foreign government to permit the discovery. But if a channel more apt to elicit the cooperation of the foreign government is plainly available but is not used, then in our view insufficient account of the requirements of international comity had been taken and the order should be set aside in the first instance." (*Volkswagenwerk, supra,* 123 Cal.App.3d at pp. 857-858, italics in original.)

The *Volkswagenwerk* court decided that in the case before it, "the Hague Convention provides an obvious and preferable alternative means of obtaining evidence from within West Germany." (*Volkswagenwerk, supra,* 123 Cal.App.3d at p. 858.) It stated: "We regard our conclusion as an exercise of judicial self-restraint designed to serve what we regard as important international goals. We could perhaps read the Hague Convention, broadly, as a preemptive and exclusive rule of international evidence-gathering, binding upon us as the supreme law of the land under clause 2 of article VI of the

federal Constitution. But we prefer to believe that the Hague Convention establishes not a fixed rule but rather a minimum measure of international cooperation; our reading of article 27 of the convention encourages us to conclude that this is, indeed, what the ratifying states intend." (*Id.* at p. 859.)[1]

In *Aérospatiale*, the United States Supreme Court also ruled that the Hague Convention is not the exclusive means of obtaining evidence abroad. "[A] rule of exclusivity would subordinate the court's supervision of even the most routine of these pretrial proceedings to the actions or, equally, to the inactions of foreign judicial authorities." (*Aérospatiale, supra,* 482 U.S. at p. 539 [107 S.Ct. at p. 2553].) The court noted the Hague Convention itself includes no statement declaring a preemptive intent. (*Ibid.*) However, the *Aérospatiale* court rejected any notion that the Hague Convention establishes a "minimum measure of international cooperation," as the *Volkswagenwerk* court believed. To the contrary, "the text of the [Hague] Evidence Convention, as well as the history of its proposal and ratification by the United States, unambiguously supports the conclusion that it was intended to establish *optional* procedures that would facilitate the taking of evidence abroad. [Citations.]" (*Id.* at p. 538 [107 S.Ct. at pp. 2552-2553], italics added.)

Furthermore, the *Aérospatiale* court specifically rejected the rule of first resort contemplated in *Volkswagenwerk*. The Supreme Court declared that "such a general rule would be unwise. In many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules.[2] A rule of first resort in all cases would therefore be inconsistent with the overriding interest in the 'just, speedy, and inexpensive determination' of litigation in our courts. See Fed.Rule Civ.Proc. 1." (*Aérospatiale, supra,* 482 U.S. at pp. 542-543 [107 S.Ct. at p. 2555].)

Regarding the comity considerations that moved the *Volkswagenwerk* court to require first resort to the Hague Convention, the *Aérospatiale* court

---

[1] In refraining from giving mandatory effect to the Hague Convention, the *Volkswagenwerk* court implicitly disagreed with an earlier Court of Appeal decision in a case with an identical title. In *Volkswagenwerk Aktiengesellschaft v. Superior Court* (1973) 33 Cal.App.3d 503, 508 [109 Cal.Rptr. 219], the Third District Court of Appeal held that "courts ordering discovery abroad must conform to the channels and procedures established by the host nation."

[2] "We observe, however, that in other instances a litigant's first use of the Hague Convention procedures can be expected to yield more evidence abroad more promptly than use of the normal procedures governing pre-trial civil discovery. In those instances, the calculations of the litigant will naturally lead to a first-use strategy."

observed: "[T]he concept of international comity requires in this context a more particularized analysis of the respective interests of the foreign nation and the requesting nation than petitioner's proposed general rule would generate.[3] We therefore decline to hold as a blanket matter that comity requires resort to Hague Evidence Convention procedures without prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." (*Aérospatiale, supra*, 482 U.S. at pp. 543-544 [107 S.Ct. at pp. 2555-2556], fn omitted.)

The court concluded that comity concerns can be addressed by a heightened level of judicial alertness to the circumstances of foreign litigants: "American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses. For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence. Objections to 'abusive' discovery that foreign litigants advance should therefore receive the most careful consideration. In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. [Citation.] American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication. [Fn. omitted.]" (*Aérospatiale, supra*, 482 U.S. at p. 546 [107 S.Ct. at p. 2557].)

---

[3]"The nature of the concerns that guide a comity analysis is suggested by the Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Tent. Draft No. 7, 1986) (approved May 14, 1986) (Restatement). While we recognize that § 437 of the Restatement may not represent a consensus of international views on the scope of the district court's power to order foreign discovery in the face of objections by foreign states, these factors are relevant to any comity analysis:

" '(1) the importance to the . . . litigation of the documents or other information requested;

" '(2) the degree of specificity of the request;

" '(3) whether the information originated in the United States;

" '(4) the availability of alternative means of securing the information; and

" '(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.' *Ibid.*"

Toutélectric and amicus curiae contend the *Aérospatiale* decision is not binding on us, and advocate maintaining *Volkswagenwerk*'s rule of first resort. We are not persuaded. Treaties such as the Hague Convention are "the supreme law of the land," and the United States Supreme Court's interpretation is authoritative. (U.S. Const., art. VI, cl. 2 & art. III, § 2, cl. 1; see *Sandsend Financial Consultants v. Wood* (Tex.App. 1988) 743 S.W.2d 364, 366 [*Aérospatiale* deemed controlling over former Texas rule of first resort]; *Scarminach v. Goldwell GmbH* (1988) 140 Misc.2d 103 [531 N.Y.S.2d 188, 190] [following *Aérospatiale*].) While it is arguable that states are free to require more generous recourse to the Hague Convention's optional procedures than was contemplated in *Aérospatiale* (see, e.g., *Husa v. Laboratoires Servier* SA (1999) 326 N.J. Super. 150 [740 A.2d 1092, 1095]), we are not inclined to do so.

*Aérospatiale* provides persuasive reasons for rejecting the rule of first resort that the *Volkswagenwerk* court added as a "qualification" to the federal approach. First, the rule grew out of the *Volkswagenwerk* court's mistaken view of the Hague Convention as imposing a "minimum measure of international cooperation" (*Volkswagenwerk, supra,* 123 Cal.App.3d at p. 859) rather than "a permissive supplement . . . [to] other means of obtaining evidence located abroad" (*Aérospatiale, supra,* 482 U.S. at p. 536 [107 S.Ct. at pp. 2551-2552]).

Second, the rule requires implementing the more cumbersome procedures of the Hague Convention, involving requests directed to judicial or other governmental authorities in the foreign country, before attempting the more direct discovery methods provided by California law. (See *Volkswagenwerk, supra,* 123 Cal.App.3d at p. 852; *Aérospatiale, supra,* 482 U.S. at p. 535 [107 S.Ct. at p. 2551].) Our statutes, like the federal rules, were designed to make discovery a "simple, convenient, and inexpensive" means of revealing the truth and exposing false claims. (*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 376 [15 Cal.Rptr. 90, 364 P.2d 266]; *Emerson Electric Co. v. Superior Court* (1997) 16 Cal.4th 1101, 1107-1108 [68 Cal.Rptr.2d 883, 946 P.2d 841]; cf. *Aérospatiale, supra,* 482 U.S. at p. 543 [107 S.Ct. at p. 2555].) There is little justification for engaging the efforts of foreign officials in pursuit of discovery under the Hague Convention if such measures turn out to be unnecessary, whether by agreement of the party from whom discovery is sought or by order of the court after conducting a comity analysis.

Moreover, if the party seeking discovery must resort first to Hague Convention procedures, the case-by-case balancing of facts, sovereign interests, and the likelihood of successful discovery prescribed by *Aérospatiale*

would occur only in those cases where the attempt to obtain discovery under the Hague Convention has failed, and the court becomes involved in efforts to enforce discovery. The *Volkswagenwerk* court viewed this as the normal procedure in federal courts. (*Volkswagenwerk, supra,* 123 Cal.App.3d at pp. 857-858.) *Aérospatiale,* however, has made it clear that the suitability of Hague Convention discovery procedures requires "prior scrutiny in each case." (*Aérospatiale, supra,* 482 U.S. at p. 544 [107 S.Ct. at p. 2556].) We believe the comity analysis is better conducted in advance, without the distorting effects that would inevitably flow from an unsuccessful resort to the Hague Convention.

For all these reasons, we conclude that *Volkswagenwerk*'s rule of first resort has been superseded by the more particularized approach outlined in *Aérospatiale.* The French Law of 1980, purporting to criminalize discovery outside the scope of the Hague Convention, does not change our analysis. The *Aérospatiale* court considered this same "blocking statute," and held: "It is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute. [Citation.] Nor can the enactment of such a statute by a foreign nation require American courts to engraft a rule of first resort onto the Hague Convention, or otherwise to provide the nationals of such a country with a preferred status in our courts. It is clear that American courts are not required to adhere blindly to the directives of such a statute." (*Aérospatiale, supra,* 482 U.S. at p. 544, fn. 29 [107 S.Ct. at p. 2556].)

We are sensitive to the concerns raised by amicus curiae regarding the mutual interests of France and California in preserving good relations. We believe California courts will protect these interests when performing the *Aérospatiale* comity analysis, which requires careful consideration of the "sovereign interests" and other "important interests" of both jurisdictions. (*Aérospatiale, supra,* 482 U.S. at p. 544 & fn. 28 [107 S.Ct. at p. 2556].) We note that French businesses such as Toutélectric must reasonably expect to comply with California law when they embark on business ventures in this state. And California businesses will be more likely to engage in enterprises with French citizens if they know that any discovery disputes that may arise will be handled by the courts with a balanced approach, rather than a mandatory application of French procedures in every case.

As stated in *Aérospatiale*: "[A] rule of exclusivity would enable a company which is a citizen of another contracting state to compete with a domestic company on uneven terms, since the foreign company would be

subject to less extensive discovery procedures in the event that both companies were sued in an American court. Petitioners made a voluntary decision to market their products in the United States. They are entitled to compete on equal terms with other companies operating in this market. But since the District Court unquestionably has personal jurisdiction over petitioners, they are subject to the same legal constraints, including the burdens associated with American judicial procedures, as their American competitors. A general rule according foreign nationals a preferred position in pretrial proceedings in our courts would conflict with the principle of equal opportunity that governs the market they elected to enter." (*Aérospatiale, supra*, 482 U.S. at p. 540, fn. 25 [107 S.Ct. at pp. 2553-2554].)

## 2. *The Party Invoking the Hague Convention Has the Burden of Persuasion*

The *Aérospatiale* holding did not specify which party bears the burden of persuasion on whether considerations of comity favor application of the Hague Convention in a particular case. However, the court's view on this question was suggested by a statement at the end of the majority opinion that the foreign litigant should not be denied "a full and fair opportunity to demonstrate appropriate reasons for employing Convention procedures in the first instance, for some aspects of the discovery process." (*Aérospatiale, supra*, 482 U.S. at p. 547 [107 S.Ct. at p. 2557].)

The majority of the courts addressing the issue have decided the burden falls on the party proposing discovery under the Hague Convention. (*In re Vitamins Antitrust Litigation* (D.D.C. 2000) 120 F.Supp.2d 45, 51 & fn. 7 [citing cases]; *Scarminach v. Goldwell GmbH, supra*, 531 N.Y.S.2d at p. 190.) We agree with this approach. It is consistent with California law generally requiring the party seeking a protective order or resisting discovery by way of objection to establish the necessity of the requested relief. (*Emerson Electric Co. v. Superior Court, supra*, 16 Cal.4th 1101, 1110; *West Pico Furniture Co. v. Superior Court* (1961) 56 Cal.2d 407, 422 [15 Cal.Rptr. 119, 364 P.2d 295]; *Stadish v. Superior Court* (1999) 71 Cal.App.4th 1130, 1145 [84 Cal.Rptr.2d 350].) It also conforms with our choice-of-doctrine rule that the party proposing use of a foreign law must identify the applicable rule and show it is appropriate in the case before the court. (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919 [103 Cal.Rptr.2d 320, 15 P.3d 1071]; *Hurtado v. Superior Court* (1974) 11 Cal.3d 574, 581 [114 Cal.Rptr. 106, 522 P.2d 666].)

## 3. *The Hague Convention Can Be Waived*

 Toutélectric and amicus curiae contend the court erred by finding that Toutélectric had waived the right to insist on compliance with Hague

Convention discovery procedures. They claim the Hague Convention cannot be waived by a litigant's failure to invoke its provisions during prior discovery, under *Pierburg, supra*, 137 Cal.App.3d 238. We conclude that *Pierburg*, like *Volkswagenwerk*, is no longer good law.

In *Pierburg*, a case arising from an automobile accident, the plaintiffs contended that Pierburg could not rely on the Hague Convention to avoid answering interrogatories, because it had voluntarily answered interrogatories propounded by a codefendant without insisting on Hague Convention procedure. The plaintiffs' interrogatories were numerous and inquired in great technical detail about Pierburg's carburetor, whereas the codefendant's interrogatories related solely to the location of photographs of the car involved in the accident. (*Pierburg, supra*, 137 Cal.App.3d at pp. 240-241.) The *Pierburg* court quoted extensively from the two *Volkswagenwerk* cases (see fn. 1, *ante*), with particular emphasis on the holding requiring first resort to the Hague Convention. (*Pierburg, supra*, 137 Cal.App.3d at pp. 241-244.)

The *Pierburg* court concluded: "In view of [these] cases . . . no elaborate analysis is needed to conclude that a civil litigant . . . cannot 'waive' the applicability of the Hague Evidence Convention by failing to assert noncompliance with that convention as to prior discovery by other parties to the action. [¶] The foundation of the convention is to avoid international friction where a domestic state court orders civil discovery to be conducted within the territory of a civil law nation that views such unilateral conduct as an intrusion upon its judicial sovereignty. The failure of one litigant in the domestic action to demand compliance with the convention cannot divest the foreign nation of its sovereign judicial rights under the convention. The convention may be waived only by the nation whose judicial sovereignty would thereby be infringed upon." (*Pierburg, supra*, 137 Cal.App.3d at pp. 244-245.)

The *Aérospatiale* decision has thoroughly undermined the premises on which *Pierburg* rested. Because Hague Convention procedures are only an optional method of pursuing discovery abroad, it stands to reason they may be waived. The Supreme Court rejected the notion that the Hague Convention enshrines the "judicial sovereignty" of signatory nations: "Petitioners contend that if performed on French soil . . . by an unauthorized person, such evidence-gathering [outside the Hague Convention] might violate the 'judicial sovereignty' of the host nation. Because it is only through the Convention that civil-law nations have given their consent to evidence-gathering activities within their borders, petitioners argue, we have a duty to

employ those procedures whenever they are available. [Citation.] We find that argument unpersuasive. If such a duty were to be inferred from the adoption of the Convention itself, we believe it would have been described in the text of that document." (*Aérospatiale, supra,* 482 U.S. at p. 543 [107 S.Ct. at p. 2555].)

We note the French Ministry of Justice appears to recognize that a party may waive rights implicating France's "judicial sovereignty," according to a letter from the ministry presented to the trial court by Toutélectric.[4] This letter from a ministry official, dated October 22, 1998, and addressed to Pierre Royer, states in part: "[S]ubject to the sovereign appreciation of Courts, it appears to me not to be conceivable that a foreign decision, pronounced while disregarding international commitments of our country and French Law, or which would not comply with the rights of defense, [would] be likely to be recognized and executed in France, on the grounds that it would be contrary to our public order." The writer adds that a French Civil Code provision grants French courts "a general and exclusive jurisdiction intended for rejecting the validity of a judgment issued by an incompetent foreign court with respect to French international law, *unless it is specified that [the] relevant French party waived the advantage of such text* [citation]. [¶] . . . [A] tacit waiver by [the] French Defendant of the advantage of the Court privilege . . . might be deduced from his behavior, if he appeared before the foreign court and if he defended himself without contesting the jurisdiction of such Court* [citations]." (Italics added.)

Furthermore, as discussed in part 2, *ante,* the party seeking to utilize Hague Convention procedures has the burden of convincing the trial court that they are justified by considerations of international comity. It necessarily follows that a party may indeed waive the claim that discovery must proceed under the Hague Convention, by failing to properly raise the issue. Amicus curiae argues that waiver is inappropriate where principles of comity are involved. However, the cases amicus curiae cites for this proposition concern failure to raise a legal issue in the trial court, resulting in waiver of an argument on appeal. (*National Ass'n of Social Workers v. Harwood* (1st Cir. 1995) 69 F.3d 622, 628; *Hoover v. Wagner* (7th Cir. 1995) 47 F.3d 845, 852.) This authority does not suggest that a party may not waive a procedural protection in the trial court whenever considerations of comity are involved. Our discussion of the particulars of this case in part 4, *post,* makes it clear that barring a waiver of Hague Convention procedures would open the door to serious abuses of the discovery process.

[4]We grant Toutélectric's motion to submit additional evidence authenticating correspondence from the French government.

We emphasize, however, that a waiver of the Hague Convention should never be lightly implied. A due regard for the interests of comity requires the courts to exercise caution and show courtesy to the foreign jurisdiction. Courts should dispense with the balancing of interests described by the *Aérospatiale* court only in those cases where the party relying on the Hague Convention has clearly abandoned the claim in prior proceedings. Just as disclosure of a privileged communication must be "significant" for the privilege to be waived (Evid. Code, § 912, subd. (a)), a party's neglect of its right to request the application of Hague Convention procedures must be substantial to support a finding of waiver.

In *Pierburg*, for instance, the defendant's response to a very limited inquiry by a codefendant would not have supported the plaintiff's claim that the defendant had waived the right to object under the Hague Convention to a comprehensive set of interrogatories. It does not serve the interests of any party to insist on strict compliance with Hague Convention procedures for every discovery request, however incidental. We are confident that counsel, by seeking stipulations where appropriate, and the courts, by applying a rule of reason, can preserve for consideration on the merits all good faith claims that discovery should proceed under the Hague Convention.

### 4. The Court Properly Found That Toutélectric Waived the Hague Convention

The record in this case amply supports the trial court's finding that Toutélectric waived the discovery procedures available under the Hague Convention. ■ A finding of waiver requires clear and convincing evidence of intentional relinquishment of a known right with awareness of the relevant facts. The waiver may be express, based on the party's words, or implied from conduct indicating an intent to relinquish the right. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619].) ■ Toutélectric's waiver of the right to insist on discovery under the Hague Convention was both express and implicit in its conduct. We first consider Toutélectric's responses to American Home's efforts to depose witnesses, which led directly to the terminating sanction underlying the judgment on appeal. We then review Toutélectric's responses to the document production requests, which led to issue preclusion sanctions but were also mentioned by the court as part of a persistent pattern of misconduct justifying the terminating sanctions.

Toutélectric's counsel demonstrated a clear awareness of his client's Hague Convention rights at the earliest stage of the discovery proceedings.

His fax to the discovery referee on September 3, 1998, reviewed the three Hague Convention methods of discovery—letters of request, the taking of evidence by diplomatic officers or consular agents, and the taking of evidence by commissioners. Counsel noted the French Law of 1980 criminalizing discovery outside the Hague Convention. He discussed the *Aérospatiale* holding, as well as the *Volkswagenwerk* and *Pierburg* cases. Nevertheless, counsel did not seek a protective order, or make a formal objection of any kind. He merely "requested" the referee to proceed with Francis Royer's deposition "in a manner consistent with the directives of the Hague Convention or in a fashion which will provide those Defendants [Royer, Toutélectric, and its other employees] protection from the requirement that they engage in criminal conduct to comply with the court's Order."

Counsel stated that if this request were denied, he would seek an expedited telephone conference with the trial court to raise these concerns. Nevertheless, counsel made no attempt to bring the matter to the court's attention. Instead, he appeared with Royer for the deposition at a Paris hotel. This early compliance with discovery outside the Hague Convention was substantial; the transcript of Royer's deposition occupies at least five volumes. In its reply brief, Toutélectric insists that Royer appeared solely in his individual capacity. Nothing in the record suggests a specially limited deposition appearance. Counsel appeared for the deposition jointly representing Toutélectric and Royer, who was a corporate director of Toutélectric. Certainly Royer's testimony was available to American Home for use in its case against Toutélectric, and Toutélectric could have objected to the manner of his deposition.

Counsel's fax to the referee demonstrates his awareness of the court's order requiring the deposition to go forward under California law. Counsel clearly understood that Toutélectric, which had not yet appeared in the case when the court rejected EEC's claims under the Hague Convention, was entitled to invoke the Convention on its own behalf. The day the fax was sent, counsel was meeting with EEC's attorney, who had represented Royer at the hearing on EEC's claim that the Hague Convention should be followed. It is fair to assume Toutélectric's counsel was aware that the court had specifically declined to rule on Toutélectric's rights under the Hague Convention.

When American Home served notice of Francis Royer's continued deposition, and of the depositions of Pierre Royer and Jacques Massat, Toutélectric initially raised no objection under the Hague Convention. Instead, it asked the court for a "limited protective order" requiring the depositions to

be taken at the American Embassy. Counsel explained: "Quite frankly, your Honor, what they're trying to do here, I'm sure you can appreciate this, they are trying to reserve their rights in France. In other words, not violate the law, and comply with what you've ordered them to do, they're trying very hard to do that. Their argument here obviously is, look, by testifying on U.S. soil I've not committed a crime in France." Thus, rather than relying on the Hague Convention, Toutélectric expressly asked the court to help it *circumvent* the Convention and proceed with discovery under California rules.

Toutélectric made no objection to the statement that depositions would be taken under California law in the request to the Ministry of Justice for assistance in scheduling depositions. When discovery resumed after the delay occasioned by Toutélectric's unsuccessful attempt to disqualify the trial court, Toutélectric did not raise the Hague Convention during court hearings in January and February 2000, at which the parties discussed rescheduling the depositions. However, in March 2000, Toutélectric informed American Home that the Royers and Massat had been advised by French counsel only to appear for depositions in accordance with the Hague Convention.

In a court hearing at the end of March, American Home complained "[t]hey're claiming now that we have to go through [the] Hague [Convention] for the French deposition. That was dealt with by your Honor years ago." Toutélectric's counsel responded: "That's not what we said. We do believe you have to go through the Hague. We're going to writ that, we'll find that out. That's beside the point. [¶] What we said was we need to apply to the American Embassy to do it, just like we did last time and we'll do everything we can to assist you in reapplying and go forward." Thus, although counsel stated he was going to file a writ petition challenging the court's ruling that the Hague Convention did not apply to the document requests, he did not insist on Hague Convention procedures for the depositions. Instead, he was willing to proceed "just like we did last time"—that is, depositions at the embassy under California rules.

At a hearing in August 2000, the parties and the court discussed the problems that had arisen with scheduling depositions at the embassy. Toutélectric did not mention the Hague Convention. Again at a hearing in September, Toutélectric did not raise the Hague Convention in connection with setting the depositions. Toutélectric's counsel told the court he and his clients had no preference between Atlanta and New York as a deposition site. However, when discussing the trial date counsel asked for enough time that deposition notices could be *served* in accordance with the Hague

Convention, as the complaint had been. Counsel made no argument on the law governing the depositions themselves, which the court had ordered to take place either in France or the United States.

In November 2000, Toutélectric informed American Home that Francis Royer would appear for deposition in Paris, but neither Pierre Royer nor Massat would appear. When American Home moved for terminating sanctions, Toutélectric for the first time presented the court with a written argument that the depositions should be taken under the Hague Convention. However, Toutélectric's inconsistent posture in this regard was concisely reflected in its statement of facts: "Throughout the current litigation, [Toutélectric] has asserted that any deposition for these individuals must be conducted in accordance with the provisions of the Hague Convention for the Taking of Evidence Abroad ("the Hague Convention"). In particular, [Toutélectric] consistently sought a manner in which depositions can be taken outside the Hague Convention and requested the depositions be taken at the United States Embassy in France." Toutélectric did not explain to the trial court, nor has it explained to this court, how seeking to take depositions outside the Hague Convention is consistent with a claim that depositions must be conducted in accordance with Hague Convention procedures.

At the hearing on the sanctions motion, Toutélectric advised the court that all three witnesses had been told by French counsel they would violate the Law of 1980 if they appeared for deposition without being summoned pursuant to the Hague Convention. However, Francis Royer, having already appeared for four or five days of deposition, was nevertheless willing to continue his deposition. When asked by the court to put on the record how the witnesses would be violating French law, Toutélectric's counsel responded that his understanding of French law was limited: "I can't stand here . . . and tell you what French law is." Counsel believed the deposition notices had to be served in accordance with the Hague Convention, and the Law of 1980 precluded evidence from being given except through Hague Convention procedures. Toutélectric did not explain to the trial court, nor has it explained to this court, why Francis Royer was available for deposition outside the Hague Convention, but the other witnesses were not.

This record provides clear and convincing evidence that Toutélectric waived its right to rely on the Hague Convention. It contended the Convention applied, but long refrained from seeking a protective order or raising any formal objection based on the Convention, and participated in Francis Royer's deposition outside the Convention. It actively sought to arrange for depositions outside the Convention and eventually agreed to produce Francis

Royer to complete his deposition outside the Convention, but raised the Convention as a bar to the deposition of other witnesses.

The record reveals a similarly inconsistent response in American Home's document requests. Toutélectric first took the position that even under the Hague Convention, it could not be compelled to produce documents.[5] Toutélectric then claimed that document disclosure was barred by the Law of 1980 unless American Home proceeded under the Hague Convention. Toutélectric later told the referee that it was not attempting "to have French law take deference [sic] over U.S. law," but rather to use its inability to respond to the document request as a defense to sanctions. It claimed the Hague Convention was "not the issue," and suggested pursuing document discovery through the French Ministry of Justice, outside of the Hague Convention.

At a court hearing in January 1999 on American Home's motion for sanctions stemming from Toutélectric's failure to produce documents, Toutélectric did not raise the Hague Convention. In March 1999, Toutélectric told the court that after discussion with French counsel, it would be able to produce public documents and those documents that had been disclosed in other litigation. Toutélectric asserted it could provide any documents voluntarily, but was prohibited from producing documents in a discovery setting unless the Hague Convention were followed. The next month Toutélectric told the court it had produced 2,800 pages of public documents and those already released in litigation. But Toutélectric insisted that other financial documents simply could not be produced in discovery "regardless of the situation." Toutélectric's counsel admitted that his understanding of French law might be faulty, but maintained his view that there were no restrictions on voluntary document disclosure. In March 2000, Toutélectric responded to American Home's sanctions motion by arguing that it could not produce documents unless American Home followed Hague Convention procedures.

---

[5]Amicus curiae explains that Toutélectric's counsel was mistaken when he informed the court that France had not adopted the Hague Convention provisions permitting document discovery. However, amicus curiae suggests the trial court had an "independent duty" to "familiarize itself with foreign law." In support of this proposition, amicus curiae cites *Gallegos v. Union-Tribune Publishing Co.* (1961) 195 Cal.App.2d 791 [16 Cal.Rptr. 185]. That case, however, stands for the unremarkable proposition that when the court takes judicial notice of the law of a foreign state, it is for the court, not the jury, to independently determine what foreign law applies. (*Id.* at pp. 797-798.) Insofar as it discussed conflict-of-law principles, *Gallegos* was long ago superseded by the current rule requiring the litigant to timely invoke foreign law and demonstrate its applicability. (*Sommer v. Gabor* (1995) 40 Cal.App.4th 1455, 1465, 1467-1468 [48 Cal.Rptr.2d 235].) Nothing in *Gallegos* suggests that a litigant may shift to the court the duty to investigate the law of a foreign jurisdiction, even when the litigant misinforms the court regarding that law.

Toutélectric now claimed first resort to the Hague Convention was required under *Volkswagenwerk, supra,* 123 Cal.App.3d 840.

Again, the court's finding that Toutélectric had waived the Hague Convention was supported by clear and convincing evidence. Toutélectric originally claimed no document discovery was available under the Hague Convention. It suggested pursuing documents through the Ministry of Justice outside the Hague Convention. At times it claimed it was unable to comply with the document request regardless of the Hague Convention, and at other times insisted it could comply only if the Hague Convention were followed. It conceded it could provide any documents it wished to release voluntarily. Eventually, Toutélectric produced boxes of documents outside the Hague Convention. Toutélectric did not explain to the trial court, nor has it informed this court, why it was able to produce 2,800 pages of documents even though American Home failed to follow Hague Convention procedures. Nor could Toutélectric's counsel answer with any certainty when the court asked him, at a late stage in the discovery proceedings, to "[s]tep by step, succinctly, without adjectives, adverbs, or argument, list for me what would be the steps for getting these documents produced under the Hague Convention."

### 5. *The Terminating Sanction Was Within the Court's Discretion*

Toutélectric makes a series of claims in an attempt to show that the court abused its discretion by striking Toutélectric's answer and entering a default. None of these arguments is meritorious. ■ The court's discretion to impose discovery sanctions is broad, subject to reversal only for manifest abuse exceeding the bounds of reason. (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 388 [97 Cal.Rptr.2d 12]; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545 [51 Cal.Rptr.2d 311].)

■ First, Toutélectric claims it acted in good faith by relying on the French Law of 1980, which limits discovery to what is permitted by the Hague Convention. Toutélectric relies on *Societe Internationale v. Rogers* (1958) 357 U.S. 197 [78 S.Ct. 1087, 2 L.Ed.2d 1255], for the proposition that terminating sanctions are improper when failure to comply with a discovery order is due to a party's inability to produce documents under the criminal law of a foreign nation. In *Rogers,* however, the petitioner had promptly and consistently maintained that the documents at issue were not under his "control" due to the effect of Swiss penal law governing disclosure of bank records. The Swiss Federal Attorney confiscated the documents, preventing their transmission to third parties. The special master appointed·

by the federal district court investigated the matter, concluding that the Swiss government had acted in accordance with its established doctrines, and the petitioner had sustained the burden of proving a good faith effort to comply with discovery. (357 U.S. at pp. 200-201 [78 S.Ct. at pp. 1089-1090].)

Here, by contrast, Toutélectric's reliance on French law was inconsistent from the beginning to the end of the discovery process. (See pt. 4, *ante.*) The discovery referee did not find that Toutélectric had acted in good faith. To the contrary, he recommended terminating sanctions if Toutélectric failed to comply in full with the document request. There is ample support in the record for the court's conclusion that Toutélectric's failure to meet its discovery obligations was "persistent, willful and unjustified."

Toutélectric's related arguments under California law are equally ineffective. It contends the terminating sanction was unduly punitive, because its failure to comply was not willful. It suggests it should have been given further opportunities to comply. It claims it would have complied, if only the court had ordered discovery to proceed under the Hague Convention. However, nothing suggests Toutélectric would have complied with the orders the trial court did make, if given more time. Had Toutélectric consistently and properly presented its Hague Convention claims to the trial court, this would be a very different case. Instead, Toutélectric first actively recommended and participated in discovery outside the Hague Convention, before standing on its rights under the Convention at a late stage of the discovery proceedings. The shifting character of Toutélectric's responses to discovery requests supported the court's finding that its obstructive conduct was willful.

Toutélectric blames American Home for delays in discovery. Delay did not cause the sanctions in this case; Toutélectric's failure to comply with discovery orders did.

Toutélectric complains that the sanctions in this case effectively rewarded American Home for its own misconduct in the federal *Valley Engineers* action. According to Toutélectric, American Home was forced to settle in that case after committing discovery abuses of its own. Toutélectric asserts the court's orders placed American Home in a better position than American Home would have occupied had Toutélectric provided discovery. It also contends the discovery sought by American Home did not relate to the errors that caused American Home to settle the *Valley Engineers* case. These arguments are irrelevant. American Home's alleged misconduct in the *Valley Engineers* action was not at issue during the discovery proceedings below.

American Home sought to recover evidence supporting its allegations that Toutélectric had schemed with EEC to shift liability for the failed construction project to American Home. Toutélectric could have had a trial on the merits if it were willing to meet its discovery obligations. It does not challenge the sufficiency of the evidence of damages presented at the prove-up hearing. None of these claims involving the *Valley Engineers* action tends to show an abuse of discretion by the trial court.

## DISPOSITION

The judgment is affirmed. American Home shall recover its costs on appeal.

McGuiness, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied January 13, 2003, and appellant's petition for review by the Supreme Court was denied April 9, 2003. Chin, J., did not participate therein.