Filed 6/1/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROCKEFELLER TECHNOLOGY INVESTMENTS (ASIA) VII, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHANGZHOU SINOTYPE TECHNOLOGY CO., LTD., <br><br> Defendant and Appellant. | B272170 <br><br> (Los Angeles County Super. Ct. No. BS149995) |

APPEAL from an order of the Superior Court of Los Angeles County, Randolph Hammock, Judge. Reversed and remanded with directions.

Law Offices of Steve Qi and Associates, Steve Qi and May T. To; Law Offices of Steven L. Sugars and Steven L. Sugars for Defendant and Appellant.

Paul Hastings, Thomas P. O'Brien, Katherine F. Murray, and Nicole D. Lueddeke for Plaintiff and Respondent.

———————————

This appeal concerns an aborted international business deal between Changzhou SinoType Technology Company, Ltd. (SinoType), a Chinese company, and Rockefeller Technology Investments (Asia) VII (Rockefeller Asia), an American investment partnership. When the relationship between the two entities soured, Rockefeller Asia pursued contractual arbitration against SinoType in Los Angeles. SinoType did not appear or participate in the arbitration proceeding, and the arbitrator entered a default award in excess of $414 million against it. The award was confirmed and judgment entered, again at a proceeding in which SinoType did not participate.

Approximately 15 months later, SinoType moved to set aside the judgment on the grounds that it had never entered into a binding contract with Rockefeller Asia, had not agreed to contractual arbitration, and had not been served with the summons and petition to confirm the arbitration award in the manner required by the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 (hereafter, Hague Service Convention or Convention). The trial court acknowledged that the service of the summons and petition had not complied with the Hague Service Convention, but concluded that the parties had privately agreed to accept service by mail. The court therefore denied the motion to set aside the judgment.

We reverse. As we discuss, the Hague Service Convention does not permit Chinese citizens to be served by mail, nor does it allow parties to set their own terms of service by contract. SinoType therefore was never validly served with process. As a result, "no personal jurisdiction by the court [was] obtained and

2

the resulting judgment [is] void as violating fundamental due process." (*County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1227.)  The trial court therefore erred in denying the motion to set aside the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.      *The Parties and the MOU*

SinoType is a Chinese company headquartered in Changzhou, China that develops and licenses Chinese fonts. Kejian (Curt) Huang (hereafter, Curt)[1], a citizen and resident of China, is SinoType's chairman and general manager.

Rockefeller Asia is an American investment partnership headquartered in New York.  Faye Huang (hereafter, Faye) is Rockefeller Asia's president.

In 2007 and 2008, Curt and Faye met several times in Los Angeles to discuss forming a new company to market international fonts.  On February 18, 2008, they signed a four-page Memorandum of Understanding (MOU), the legal significance of which is disputed.  The MOU stated that the parties intended to form a new company, known as World Wide Type (WWT), which would be organized in California and have its principal offices in the Silicon Valley.  SinoType would receive an 87.5 percent interest in WWT "and shall contribute 100% of its interests in the companies comprising Party A, i.e., Changzhou SinoType Technology."  Rockefeller Asia would receive a 12.5 percent interest in WWT "and shall contribute 100% of its

---

[1]      Because two principals share a last name (although they are not related to one another), for clarity we refer to them by their first names.

3

interests in the companies comprising Party B, i.e., Rockefeller Technology Investments (Asia) VII."

The MOU provided that "[t]he parties shall proceed with all deliberate speed, within 90 days if possible, to draft and to all execute long form agreements carrying forth the agreements made in this Agreement, together with any and all documents in furtherance of the agreements." It also provided, however, that "[u]pon execution by the parties, this Agreement shall be in full force and effect and shall constitute the full understanding of the Parties that shall not be modified by any other agreements, oral or written."

The MOU contained several provisions governing potential disputes between the parties, as follows:

"6.     The Parties shall provide notice in the English language to each other at the addresses set forth in the Agreement via Federal Express or similar courier, with copies via facsimile or email, and shall be deemed received 3 business days after deposit with the courier.

"7.     The Parties hereby submit to the jurisdiction of the Federal and State courts in California and consent to service of process in accord with the notice provisions above.

"8.     In the event of any disputes arising between the Parties to this Agreement, either Party may submit the dispute to the Judicial Arbitration & Mediation Service in Los Angeles for exclusive and final resolution pursuant to according to [*sic*] its streamlined procedures before a single arbitrator . . . . Disputes shall include failure of the Parties to come to Agreement as required by this Agreement in a timely fashion."

*B.    The 2013 Arbitration*

The relationship between the parties soured, and in February 2012, Rockefeller Asia filed a demand for arbitration with the Judicial Arbitration & Mediation Service (JAMS) in Los Angeles.[2]  SinoType did not appear at the arbitration, which proceeded in its absence.

The arbitrator issued a final award on November 6, 2013.[3]  He found as follows:

Rockefeller Asia is a special-purpose entity organized to provide capital to support technology companies in Asia.  Its partners include Rockefeller Fund Management Co., LLC.

In February 2008, SinoType and Rockefeller Asia entered into a MOU in which they agreed to form a new company (WWT).  Each party was to contribute its entire interest in its business to WWT.  In return, SinoType was to receive an 87.5 percent interest, and Rockefeller Asia was to receive a 12.5 percent interest, in WWT.  In 2008, Rockefeller Asia was funded with stock worth $9.65 million.

---

[2]    Rockefeller Asia contends the demand for arbitration was properly served in accordance with the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, codified as title 9 of the United States Code, sections 201 et seq.  However, the propriety of the service of the arbitration demand is not before us, and thus we do not reach the issue.

[3]    The award stated that because SinoType had not appeared, the case proceeded under Article 27 of the JAMS International Rules, which authorizes an arbitrator to proceed by default where one party has failed to appear.

In 2010, the parties sought additional investors to buy a 10 percent interest in WWT. The highest offer, obtained in May 2010, was for $60 million. After receiving this offer, SinoType insisted that Rockefeller Asia agree to a reduction of its interest. When Rockefeller Asia refused, SinoType unilaterally terminated the MOU.

Rockefeller Asia's damages expert opined that Rockefeller Asia's damages included three components: loss of its 12.5 percent interest in WWT; loss of its control premium, which the expert valued at 10 percent of WWT's total value; and loss of its anti-dilution rights, which the expert valued at 6.25 percent of WWT's total value. Thus, Rockefeller Asia's damages were equal to 28.75 percent (12.5% + 10% + 6.25% = 28.75%) of WWT's value. The expert opined that WWT's value at the time SinoType terminated the MOU was $600 million, and therefore Rockefeller Asia's damages at termination were approximately $172 million ($600,000,000 x .2875 = $172,500,000). However, the expert opined that Rockefeller's damages should be valued at the time of the arbitration, not the time of the termination. He estimated SinoType's value at the time of arbitration using "the 'wave' method . . . which assumes that [the company's] value has grown over the same interval at the same rate as other firms 'riding the same economic wave.' " The expert selected Apple Corporation as the "comparator firm," and estimated SinoType's current value by assuming a 240 percent increase between July 2010 and February 2012—i.e., the same increase that Apple experienced during a comparable period. The expert thus estimated Rockefeller Asia's damages to be $414 million, which was "28.5% of the estimated total value of [SinoType] of $1.440 billion, using the wave method."

The Arbitrator "accept[ed] the evidence presented through [Rockefeller Asia's expert] concerning the percentage values of the control premium and the anti-dilution clause," and also "adopt[ed] [Rockefeller Asia's] proposal to set the date of valuation at February 2012."  Based on the foregoing, the arbitrator awarded Rockefeller Asia $414,601,200.

C.     *Order Confirming the Arbitration Award*

Rockefeller Asia filed a petition to confirm the arbitration award.  Subsequently, it filed a proof of service of summons, which declared that it had served SinoType in China by Federal Express on August 8, 2014, in accordance with the parties' arbitration agreement.

Following a hearing at which SinoType did not appear, on October 23, 2014, the trial court confirmed the arbitration award and entered judgment for Rockefeller Asia in the amount of $414,601,200, plus interest of 10 percent from November 6, 2013.

D.     *SinoType's Motion to Set Aside the Judgment*

On January 29, 2016, SinoType filed a motion to set aside the judgment and to quash service of the summons.  The motion asserted that the order confirming the arbitration award and resulting judgment were void because SinoType had not been validly served with the summons and petition to confirm. SinoType explained that because it is a Chinese company, Rockefeller Asia was required to serve the summons and petition pursuant to the Hague Service Convention.  Rockefeller Asia did not do so.  Instead, it served SinoType by Federal Express, which is not a valid method of service on Chinese citizens under the Convention.  Moreover, the parties had not intended the MOU to be a binding agreement, and thus the MOU's provision for mail service was not enforceable.

In support of its motion, SinoType submitted the declaration of Curt Huang, which stated in relevant part as follows:

Curt met Faye in 2007. Faye introduced herself as the CEO of Rockefeller Pacific Ventures Company and offered to introduce Curt to Nicholas Rockefeller (Rockefeller), who Faye said might be interested in investing in a project. Curt met with Rockefeller in July 2007 and discussed forming a new company that would develop software with fonts in many different alphabets and languages. Rockefeller expressed interest in the project. However, "[t]he name of the Rockefeller entity which Nicholas Rockefeller proposed to do business with SinoType changed on several occasions" and Curt "grew increasingly uncomfortable about the lack of clarity as to which company Nicholas Rockefeller proposed to do business with SinoType."

The parties met several more times in 2007 and 2008, but they did not make significant progress in consummating a deal. In February 2008, Faye offered to prepare a document referred to in Chinese as a "bei wang lu." According to Curt, a "bei wang lu" is a memorandum of understanding between parties that records the current state of negotiations; it "does not necessarily reflect terms to which the parties have agreed" and "is often used where there has been no real progress in a business meeting to memorialize the discussion so that the parties can pick up on the negotiations at a later meeting." The signing of a "bei wang lu" "does not create a binding contract." In contrast, Curt said, there are three other kinds of Chinese agreements: a "yi xiang shu" is "a letter of intent and reflects the intentions of the parties to enter into an agreement before a formal contract exists;" a "xie yi" is an agreement "which is usually, but not always legally

8

binding;" and a "he tong" is "a formal contract, which is legally enforceable."

In February 2008, Faye presented Curt with a draft "bei wang lu." Curt said he had only about 10 minutes to review the document, but he told Faye that many of the proposed terms were unacceptable, including the designation of "Party B" as Rockefeller Asia (an entity Curt said he had never heard of), the anti-dilution protections for Rockefeller Asia, and the failure to indicate the amount of Rockefeller Asia's proposed contribution to the project. Curt was reluctant to sign the document, but was convinced to do so by Faye's assurances that the terms would be modified in a long-form agreement (or "xie yi") that would be drafted within 90 days. Curt ultimately signed the document "because I knew it was not a binding document and I wanted to see progress on the deal. I felt the MOU would push Rockefeller to draft the long form agreement within 90 days."

When he signed the MOU, Curt "had no intention to waive SinoType's right to service of process or [to] agree[] to arbitration. Because I only had ten minutes to review the MOU, I did not even know that it contained a statement saying SinoType would agree to alternate service. I believed that the 'bei wang lu' had no legal implications and all of the terms would be negotiated and modified later in the actual contract."

In February 2010, Faye and Rockefeller told Curt they wanted a 12.5 percent equity in the new venture. Curt said he would be willing to give them equity on a commission basis once they raised capital, but he would not consider giving them any equity in the new company before they had raised funds.

In June 2010, Faye emailed Curt a draft Stock Purchase Agreement and other ancillary agreements. The draft "was not

something to which [Curt] could or would ever agree." Curt told Faye he would not sign the draft documents. Communications between the parties ended in March 2011.

Curt received a letter at the end of January 2012 that referenced arbitration. He did not believe he had to respond to the letter because it was not a court document. He received subsequent FedEx packages and emails from Rockefeller, but he did not open them.

In March 2015, Curt heard from a client that Rockefeller Asia was alleging that SinoType owed it money. He then sought the advice of counsel, who opened the FedEx packages. That was when Curt learned an arbitrator had awarded Rockefeller Asia more than $414 million, which Curt said was more than 70 times SinoType's total revenue for the entire period from 2009 to 2013.

Rockefeller Asia did not transfer stock to SinoType, nor did it ever propose to do so.

### E. Rockefeller Asia's Opposition to Motion to Set Aside the Judgment

Rockefeller Asia opposed SinoType's motion to set aside the judgment, urging that the motion was untimely; the 2008 MOU was valid and enforceable; and the summons and petition to confirm the arbitration award had been properly served. In support of its opposition, Rockefeller Asia submitted Faye Huang's declaration, which stated in relevant part as follows:

By the end of 2007, Rockefeller Asia and SinoType had decided to enter into a formal arrangement. On February 18, 2008, Faye and Curt executed the MOU. "At no point did I represent to Curt in either the English or the Mandarin Chinese language that the 2008 Agreement would not be considered an enforceable agreement . . . . There would be no purpose for Curt

10

and me to sign the 2008 Agreement if that document was to be considered a nullity. At no point did Curt state that he disagreed with a single term in the [MOU] or inform me that the . . . provisions were not exactly as we had agreed."

Upon the signing of the MOU, "an Assignment of Partnership Interests was executed by the Rockefeller Parties pursuant to which they transferred their partnership interest, which had a value of $9.65 million, to SinoType per the terms of the [MOU]."

Faye declared that "Curt and I intended the [MOU] to be effective and binding immediately, as its term provided that it could be modified only in a writing signed by both parties. However, we also anticipated that, while the short-form agreement would suffice for our mutual needs, a long-form agreement that would satisfy the very strenuous and impersonal requirements of the international investment community would be necessary to attract additional institutional investors in the future. Therefore, the [MOU] called for the parties to try to have the long-form agreement available 'with all deliberate speed,' within 90 days if possible." However, the 90-day guideline for preparing the long-form documents "proved impossible." Due to the 2008 recession, no third-party financing was on the horizon, and thus "the parties continued to operate under the binding 2008 Agreement." Throughout this time, Rockefeller Asia "continued to perform and to supply tangible and intangible resources to SinoType."

According to to Faye's declaration, SinoType survived the economic downturn in large part because of Rockefeller Asia's efforts, and by 2009 SinoType's internal evaluation showed that its then-current value approached $500 million and would

11

increase in five years to almost $2 billion. Ultimately, however, the relationship between the companies began to deteriorate, and in July 2010, SinoType informed Rockefeller Asia that it had abrogated the MOU and Rockefeller Asia no longer owned a 12.5 percent interest in SinoType. Further, Curt told Faye that as a Chinese company, SinoType was immune to American legal remedies and would refuse to participate in any legal process in the United States.

F. *Order Denying Motion to Set Aside Judgment*

On April 15, 2016, the trial court denied the motion to set aside the judgment. The court found that service by Federal Express was permitted by the MOU, which the arbitrator had found to be a binding contract. Further, although the court found that Rockefeller Asia had not properly served SinoType under the Hague Service Convention, it concluded that the parties were permitted to contract around the Convention's service requirements. It explained: "To allow parties to enter into a contract with one another and then proceed to unilaterally disregard provisions out of convenience, like the one at issue here, would allow parties to simply return to their respective countries in order to avoid any contractual obligations. As aptly noted by [Rockefeller Asia] in its opposition, this would essentially result in anarchy and turn the entire international arbitration law on its head. . . . Furthermore, this court cannot find (and [SinoType] has not provided) any case law that would indicate parties are not permitted to contractually select alternative means of service and thus they are not able to waive the service provisions within the Hague Convention."

Finally, the court said, "assuming for the sake of argument that somehow [Rockefeller Asia] was actually required to serve

the Summons and Petition in this action upon [SinoType] in the manner suggested by [SinoType] (to wit, vis-a-vis the protocols established by the Chinese government), once [SinoType] was 'served' with the Summons and Petition in the manner which actually occurred in this case it had an obligation do something – to do exactly what it is doing now – to specially appear and to file a motion to quash. This is what is called acting with 'diligence.' . . . [¶] The law is well settled that if a party is seeking to obtain relief from this court's equitable powers, it must act with reasonable diligence. [Citations.] Thus, to the extent that [SinoType] is also seeking to have this court exercise its broad equitable powers to grant the requested relief, under the totality of the circumstances it respectfully declines to grant such equitable relief due to the lack of reasonable diligence by the defendant in seeking relief . . . ."

SinoType timely appealed from the order denying the motion to set aside the judgment.[4]

---

[4] SinoType has filed a request for judicial notice in connection with this appeal. Such notice is available in the trial court "and, independently, in the Court of Appeal (Evid. Code, § 459) which is not bound by the trial court's determination." (*Volkswagenwerk Aktiengesellschaft v. Superior Court* (1981) 123 Cal.App.3d 840, 852, superseded on other grounds as stated in *American Home Assurance Co. v. Societe Commerciale Toutelectric* (2002) 104 Cal.App.4th 406, 409.) We grant the request as to the Hague Service Convention and articles 260 and 261 of the Civil Procedure Law of the People's Republic of China (exhibits 3, 4, and 5), and otherwise deny it. (See *Noergaard v. Noergaard* (2015) 244 Cal.App.4th 76, 81, fn. 1 [judicial notice of Hague Convention]; *Societe Civile Succession Richard Guino v. Redstar Corp.* (2007) 153 Cal.App.4th 697, 701, superseded by statute on another ground as stated in *Hyundai Securities Co.*

13

## DISCUSSION

SinoType contends the trial court was required to set aside the judgment because Rockefeller Asia never properly served it with the summons and petition to confirm the arbitration award. Specifically, SinoType urges that: (1) mail service in China is not authorized by the Hague Service Convention; (2) the Convention's service provisions were not superseded by the MOU; and (3) Rockefeller Asia's failure to properly serve the summons and petition rendered the judgment void and, thus, subject to being set aside at any time.

Rockefeller Asia agrees that the Convention does not permit mail service in China, but it urges that parties may *by contract* set their own terms of service. Rockefeller Asia further urges that it served the summons and petition on SinoType in the manner provided by the MOU; and, in any event, SinoType's motion to set aside the judgment was untimely.

As we now discuss, the Hague Service Convention does not permit parties to set their own terms of service by contract. Instead, it requires service on foreign parties to be carried out as specified in the Convention by the receiving country. China does not permit its citizens to be served by mail, and thus SinoType was not validly served with the summons and petition. In the absence of proper service, the trial court never obtained personal jurisdiction over SinoType, and thus the judgment against SinoType necessarily was void. Because a void judgment can be set aside at any time, SinoType's motion to set aside the

---

*Ltd. v. Ik Chi Lee* (2013) 215 Cal.App.4th 682, 693 [judicial notice of law of a foreign nation].)

14

judgment necessarily was timely.  The trial court therefore erred in denying SinoType's motion to set aside the judgment.

# I.
# Standard of Review

We review the order denying SinoType's motion to set aside the judgment for an abuse of discretion.  (*J.M. v. G.H.* (2014) 228 Cal.App.4th 925, 940; *County of San Diego v. Gorham* (2010) 186 Cal.App.4th 1215, 1225 (*Gorham*).)  " ' "The abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria." ' [Citation.]  The scope of the trial court's discretion is limited by law governing the subject of the action taken.  [Citation.]  An action that transgresses the bounds of the applicable legal principles is deemed an abuse of discretion.  [Citation.]  In applying the abuse of discretion standard, we determine whether the trial court's factual findings are supported by substantial evidence and independently review its legal conclusions.  [Citation.]" (*In re Marriage of Drake* (2015) 241 Cal.App.4th 934, 939–940.)

# II.
# Rockefeller Asia Did Not Properly Serve SinoType with the Summons and Petition to Confirm the Arbitration Award

## A.  *The Hague Service Convention*

The Hague Service Contention "is a multinational treaty formed in 1965 to establish an 'appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time.' (Hague Convention preamble, 20 U.S.T. 361, 362, T.I.A.S. No. 6638, reprinted in 28 U.S.C.A. Fed.R.Civ.P. 4, note, at 130 (West Supp.

15

1989).) The Hague Convention provides specific procedures to accomplish service of process. Authorized modes of service are service through a central authority in each country; service through diplomatic channels; and service by any method permitted by the internal law of the country where the service is made. (See [Hague Service Convention], arts. 2–6, 8, 19; see also discussion in *Bankston v. Toyota Motor Corp*. (8th Cir. 1989) 889 F.2d 172, 173.) Each signatory nation may ratify, or object to, each of the articles of the [Hague Service Convention]. ([Hague Service Convention], art. 21.)" (*Honda Motor Co. v. Superior Court* (1992) 10 Cal.App.4th 1043, 1045 (*Honda Motor Co.*).) Both the United States and China are signatories (sometimes referred to as "contracting States") to the Hague Service Convention. (Hague Conference on Private International Law, 14: Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (Apr. 11, 2018) Status Table <https://www.hcch.net/en/instruments/conventions/status-table/?cid=17> [as of May 31, 2018].)

In the United States, state law generally governs service of process in state court litigation. However, by virtue of the Supremacy Clause, United States Constitution, Article VI, the Convention preempts inconsistent methods of service prescribed by state law in all cases to which the Convention applies. (See *Volkswagenwerk Aktiengesellschaft v. Schlunk* (1988) 486 U.S. 694, 699 [108 S.Ct. 2104, 100 L.Ed.2d 722] (*Volkswagenwerk*).) Thus, although a summons issued by a California state court generally must be served pursuant to the Code of Civil Procedure (§§ 413.10 et seq.), service in the present case was governed by the Hague Service Convention, not the Code of Civil Procedure.

16

(See *Honda Motor Co.*, *supra*, 10 Cal.App.4th at p. 1049 ["the preemptive effect of the Hague Convention as to service on foreign nationals is beyond dispute"].)

      **B.**    *The Convention Does Not Permit Mail Service on Citizens of Countries That, Like China, Have Filed Objections to Article 10 of the Convention*

Article 2 of the Convention provides that each contracting state shall designate a "Central Authority" that will receive requests for service from other contracting states. (Hague Service Convention, *supra*, 20 U.S.T. at p. 362.) Article 5 provides that the Central Authority of the state addressed "shall itself serve the document or shall arrange to have it served by an appropriate agency, either –

"(a)    by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

"(b)    by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed." (Hague Service Convention, *supra*, 20 U.S.T. at pp. 362-363.)

Article 10 of the Convention provides for alternative methods of service if permitted by the "State of destination." As relevant here, it says: "*Provided the State of destination does not object*, the present Convention shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad." (Hague Service Convention, *supra*, 20 U.S.T. at p. 363, italics added.)

China has filed a "reservation" to Article 10, which states that it "oppose[s] the service of documents in the territory of the People's Republic of China by the methods provided by Article 10

17

of the Convention." (Hague Conference on Private International Law, Declaration/Reservation/Notification <https://www.hcch.net/en/states/authorities/notifications/?csid=393&disp=resdn> [as of May 31, 2018].) Accordingly, foreign plaintiffs "cannot rely on Article 10's allowance for service via 'postal channels' because [China] is among the countries who have formally objected to such means of service, rendering Article 10 inapplicable." (*Prince v. Government of People's Republic of China* (S.D.N.Y. Oct 25, 2017, No. 13-CV-2106 (TPG)) 2017 WL 4861988, p. *6; see also *Zhang v. Baidu.com Inc.* (S.D.N.Y. 2013) 932 F.Supp.2d 561, 567 [mail service of summons and complaint on Chinese defendant did not constitute proper service: "[T]he Hague Convention allows for service through 'postal channels,' but only if 'the State of destination does not object.' . . . China has objected."]; and see *Pats Aircraft, LLC v. Vedder Munich GmbH* (D. Del. 2016) 197 F.Supp.3d 663, 673 ["Germany . . . has specifically objected to service by mail under the Hague Convention. [Citation.] As such, service of process upon a non-resident defendant in Germany must comply with the other relevant service provisions of the Hague Convention."]; *RSM Production Corp. v. Fridman* (S.D.N.Y May 24, 2007, No. 06 Civ. 11512 (DLC)) 2007 WL 1515068, p. *2 ["The Hague Service Convention . . . prohibits service through certified international mail or Federal Express International Priority mail on individuals residing in the Russian Federation due to that country's objection to Article 10"]; *Shenouda v. Mehanna* (D.N.J. 2001) 203 F.R.D. 166, 171 ["Article 10 permits parties to send judicial documents via postal channels or through judicial officers in the receiving nation. [Citation.] This provision, however, is inapplicable here because Egypt has objected to Article 10 in its

entirety."]; *Honda Motor Co., supra*, 10 Cal.App.4th at p. 1049 ["Since the attempted mail service on Honda was improper under the Hague Convention, the trial court should have granted the motion to quash service on defendant Honda."].)

Accordingly, because China has objected to Article 10, Rockefeller Asia's mail service of the summons and petition on SinoType was not effective under the Hague Service Convention.

C.       *Parties May Not Contract Around the Convention's Service Requirements*

Rockefeller Asia concedes that mail service on Chinese citizens by foreign litigants is not permitted under the Convention.  It urges, however, that parties can "contract around" the Convention's service requirements.  For the reasons that follow, we do not agree.

"In interpreting an international treaty, we are mindful that it is 'in the nature of a contract between nations,' [citation], to which '[g]eneral rules of construction apply.'  [Citations.]  We therefore begin 'with the text of the treaty and the context in which the written words are used.'  [Citation.]  The treaty's history, ' "the negotiations, and the practical construction adopted by the parties" ' may also be relevant.  [Citation.]" (*Société Nat. Ind. Aéro. v. U.S. Dist. Court* (1987) 482 U.S. 522, 533–534 [107 S.Ct. 2542, 2550, 96 L.Ed.2d 461] (*Société*).)

By its own terms, the Convention applies to "*all cases*, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad."  (Hague Service Convention, *supra*, 20 U.S.T. at p. 362, italics added.) This language "is *mandatory*."  (*Volkswagenwerk, supra*, 486 U.S.

19

at p. 699, italics added; see also *Société, supra*, 482 U.S. at p. 534, fn. 15 [same].)[5]

Further, the Convention emphasizes the right of *each contracting state*—not the citizens of those states—to determine how service shall be effected.  For example, Article 2  of the Convention provides that each state shall organize a Central Authority "which will undertake to receive requests for service coming from other contracting States"; Article 5 provides that each state shall effect service in the manner requested "*unless such a method is incompatible with the law of the State addressed* [i.e., the receiving state]"; and Article 11 provides that the Convention "shall not prevent two or more *contracting States* from agreeing to permit . . . channels of transmission other than those provided for in the preceding articles."  (Hague Service Convention, *supra*, 20 U.S.T. at pp. 362-364, italics added.)  As relevant here, Article 261 of the Civil Procedure Law of the People's Republic of China (of which we have taken judicial notice) provides that a request for judicial assistance "shall be conducted through channels stipulated to in the international

---

[5]    In contrast, the United States Supreme Court has held that the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (Evidence Convention), 23 U.S.T. 2555, T.I.A.S. No. 7444, which does not contain analogous mandatory language, does *not* "purport to describe the procedures for all permissible transnational discovery and exclude all other existing practices."  (*Société, supra*, 482 U.S. at p. 534.)  The court found the Evidence Convention's omission of mandatory language "particularly significant in light of the same body's use of mandatory language in the preamble to the Hague Service Convention, 20 U.S.T. 361, T.I.A.S. No. 6638."  (*Id*. at p. 534, fn. 15.)

treaties concluded or acceded to by the People's Republic of China. . . . Except for the circumstances specified in the preceding paragraph, no foreign agency or individual may serve documents . . . within the territory of the People's Republic of China without the consent of the in-charge authorities of the People's Republic of China." Permitting private parties to avoid a nation's service requirements by contract is inconsistent with Article 261, as well as with the Convention's stated intention to avoid infringing on the "sovereignty or security" of member states. (See Hague Service Convention, *supra*, 20 U.S.T. at p. 364.)

Finally, as we have said, the Convention expressly allows each "State of destination" to decide whether to permit mail service on its citizens by foreign defendants. (See Hague Service Convention, *supra*, 20 U.S.T. at p. 363 [Convention does not prohibit mail service "[*p*]*rovided the State of destination does not object*"], italics added.) The Convention does not include an analogous provision allowing private parties to international contracts to agree to accept service by mail.

Rockefeller Asia does not offer any "plausible textual footing" (*Water Splash, Inc. v. Menon* (2017) __ U.S. __, __ [137 S.Ct. 1504, 1509–1510, 197 L.Ed.2d 826]) for the proposition that parties may contract around the Hague Service Convention, but instead relies on two cases from other jurisdictions, neither of which is persuasive. The first, *Alfred E. Mann Living Trust v. ETIRC Aviation S.A.R.L.* (N.Y. App. 2010) 78 A.D.3d 137, 141, 910 N.Y.S. 2d 418 (*Alfred E. Mann*), provides no textual analysis to support the New York Court of Appeal's conclusion that the requirements of the Convention may be waived by contract; the court simply says that it can see "no reason why" it should reach

21

a contrary conclusion. The analysis of *Masimo Corp. v. Mindray DS USA Inc.* (C.D. Cal., Mar. 18, 2013) 2013 WL 12131723 is equally cursory; the district court stated: "The Court sees no reason why parties may not waive by contract the service requirements of the Hague Convention, especially given that parties are generally free to agree to alternative methods of service. [Defendant] provides no authority to the contrary, and the Court's position is in accord with [*Alfred E. Mann*]." (*Id.* at p. 3.)[6]

Consistent with the Convention's language, we therefore conclude that parties may not agree by contract to accept service of process in a manner not permitted by the receiving country. Accordingly, because service on SinoType was effected by international mail, which is not a permitted form of service on Chinese citizens under the Convention, we conclude that SinoType was not validly served with the summons and petition to confirm the arbitration award.

## III.

### Because SinoType Was Not Properly Served with the Summons and Petition, the Court Did Not Acquire Jurisdiction Over SinoType, and the Resulting Judgment Is Void

Having concluded that SinoType was not validly served with the summons and petition, we now consider the effect of the

---

[6] The two remaining cases on which Rockefeller Asia relies address the Hague Convention on Taking of Evidence Abroad, *not* the Hague Service Convention. (*Image Linen Services, Inc. v. Ecolab, Inc.* (M.D. Fla., Mar. 10, 2011) 2011 WL 862226, pp. *4–5 & fn. 6; *Boss Mfg. Co. v. Hugo Boss AG* (S.D.N.Y., Jan. 13, 1999) 1999 WL 20828, p. *1.)

invalid service.  SinoType contends that because it was not properly served with the summons and petition, the trial court did not acquire jurisdiction over it, and the resulting judgment thus is void.  Rockefeller Asia disagrees, contending that the judgment was valid because SinoType had actual notice of the proceedings and did not timely move to set aside the judgment.  As we now discuss, SinoType is correct.

> A.  *A Judgment Obtained in the Absence of Proper Service of Process Is Void*

Compliance with the statutory procedures for service of process " ' "is essential to establish personal jurisdiction." ' [Citation.]"  (*Renoir v. Redstar Corp.* (2004) 123 Cal.App.4th 1145, 1152 (*Renoir*).)  Thus, in *Honda Motor Co.*, *supra*, 10 Cal.App.4th 1043, the court held that service on a Japanese corporation that did not comply with the Hague Service Convention had to be quashed even though the Japanese defendant had actually received the summons and complaint.  The court explained:  "[Plaintiff's] arguments share a common fallacy; they assume that in California, actual notice of the documents or receipt of them will cure a defective service.  That may be true in some jurisdictions, but California is a jurisdiction where the original service of process, which confers jurisdiction, must conform to statutory requirements or all that follows is void.  [Citations.] . . . [¶] . . . [¶]  Plaintiff argues that it is ridiculous, wasteful and time consuming to reverse the trial court just to force plaintiff to go through the motions of a service under the convention, when there is no question but that Honda has notice of the action, its attorneys stand ready to defend it, and no practical aim can be accomplished by quashing the service.  However, plaintiff cites no authority permitting a California

23

court to authorize an action to go forward upon an invalid service of process. The fact that the person served 'got the word' is irrelevant. [Citations.] 'Mere knowledge of the action is not a substitute for service, nor does it raise any estoppel to contest the validity of service.' [Citation.] '[O]ur adherence to the law is required if we are ever to instill respect for it.' [Citation.] The *Abrams* court[7] felt it could not rewrite the work of the California Legislature; *how much less are we able to rewrite a federal treaty*." (*Honda Motor*, *supra*, 10 Cal.App.4th at pp. 1048–1049, italics added.)

Where the defendant establishes that he or she has not been served as mandated by the statutory scheme, "no personal jurisdiction by the court will have been obtained and the resulting judgment *will be void* as violating fundamental due process. (See *Peralta* [*v. Heights Medical Center, Inc.* (1988)] 485 U.S. [80,] 84.)" (*Gorham*, *supra*, 186 Cal.App.4th 1215, 1227, italics added [reversing order denying motion to set aside a default judgment because plaintiff had not been properly served with the summons and complaint]; see also *Renoir*, *supra*, 123 Cal.App.4th at p. 1154 ["Because no summons was served on any of the defendants and the defendants did not generally appear in the proceeding, the trial court had no jurisdiction over them. Therefore, the California judgment was void, as is the order denying the motion to vacate the California judgment."];

---

**7** *In re Abrams* (1980) 108 Cal.App.3d 685, 695 [annulling contempt judgment against witness because witness subpoena had not been personally served as required by statute; "the process was not served in the manner required by law and defendant may not be criminally punished for failure to obey the subpoena."].)

*Lee v. An* (1008) 168 Cal.App.4th 558, 564 ["[I]f a defendant is not validly served with a summons and complaint, the court lacks personal jurisdiction and a . . . judgment in such action is subject to being set aside as void."].)[8]

As we have discussed, SinoType was not served with the summons and petition in the manner required by the Hague Service Convention. Accordingly, the court did not acquire personal jurisdiction over SinoType, and the resulting judgment was void.

### B. *SinoType's Motion to Set Aside the Judgment Was Timely*

The final issue before us is whether the trial court abused its discretion by failing to set aside the void judgment. SinoType contends that a void judgment is "void ab initio . . . a nullity" that may be set aside at any time. Rockefeller Asia disagrees, contending that " '[o]nce six months have elapsed since the entry of judgment, a trial court may grant a motion to set aside that judgment as void only if the judgment was *void on its face*.' "

There is a wealth of California authority for the proposition that a void judgment is vulnerable to direct or collateral attack " ' "*at any time*." ' " (*Strathvale Holdings v. E.B.H.* (2005) 126 Cal.App.4th 1241, 1249, italics added, quoting *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660.)

---

[8] "A lack of fundamental jurisdiction is ' " 'an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' [Citation.] . . ." [¶] . . . "[F]undamental jurisdiction cannot be conferred by waiver, estoppel, or consent. Rather, an act beyond a court's jurisdiction in the fundamental sense is null and void" *ab initio*.' " (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 339.)

25

For example, in *Gorham*, *supra*, 186 Cal.App.4th 1215, the Court of Appeal held that the failure to vacate a void judgment entered nearly 10 years earlier was an abuse of discretion.  The court explained:  "[W]here it is shown that there has been a complete failure of service of process upon a defendant, he generally has no duty to take affirmative action to preserve his right to challenge the judgment or order even if he later obtains actual knowledge of it because '[w]hat is initially void is ever void and life may not be breathed into it by lapse of time.'  [Citation.]  Consequently under such circumstances, 'neither laches nor the ordinary statutes of limitation may be invoked as a defense' against an action or proceeding to vacate such a judgment or order.  [Citation.]"  (*Id*. at p. 1229.)

In so concluding, the court specifically rejected the proposition that the judgment would be set aside only if void "on its face":  "Although courts have often also distinguished between a judgment void on its face, i.e., when the defects appear without going outside the record or judgment roll, versus a judgment shown by extrinsic evidence to be invalid for lack of jurisdiction, the latter is still a void judgment with all the same attributes of a judgment void on its face.  [Citation.]  'Whether the want of jurisdiction appears on the face of the judgment or is shown by evidence *aliunde*, in either case the judgment is for all purposes a nullity—past, present and future.  [Citation.]  ". . . All acts performed under it and all claims flowing out of it are void . . . .  No action upon the part of the plaintiff, no inaction upon the part of the defendant, no resulting equity in the hands of third persons, no power residing in any legislative or other department of the government, can invest it with any of the elements of power or of vitality."  [Citation.]'  [Citation.]  In such cases, the

26

judgment or order is wholly void, although described as 'voidable' because court action is required to determine the voidness as a matter of law, and is distinguishable from those judgments merely voidable due to being in excess of the court's jurisdiction. [Citation.] *Consequently, once proof is made that the judgment is void based on extrinsic evidence, the judgment is said to be equally ineffective and unenforceable as if the judgment were void on its face because it violates constitutional due process.* (See *Peralta v. Heights Medical Center*, *supra*, 485 U.S. [at p.] 84.)" (*Gorham*, *supra*, 186 Cal.App.4th at p. 1226, italics added.)[9]

Similarly, the Court of Appeal in *Falahati v. Kondo* (2005) 127 Cal.App.4th 823, held that the trial court erred in failing to grant a motion to set aside a default judgment filed 10 months after entry of judgment. It explained that although a motion for relief from a default judgment under Code of Civil Procedure sections 473, subdivision (b), or 473.5, subdivision (a), usually must be filed within six months from entry of the judgment, "[a] *void* judgment can be attacked *at any time* by a motion under

---

[9] The *Gorham* court also rejected the plaintiff's contention that the trial court was not required to vacate the judgment because the defendant had actual knowledge of it: "Knowledge by a defendant of an action will not satisfy the requirement of adequate service of a summons and complaint. [Citations.] . . . [I]t has been said that a judgment of a court lacking such personal jurisdiction is a violation of due process (*Burnham v. Superior Court of Cal., Marin County* (1990) 495 U.S. 604, 609), and that 'a default judgment entered against a defendant who was not served with a summons in the manner prescribed by statute [to establish personal jurisdiction] is void.' (*Dill v. Berquist Construction Co.* (1994) 24 Cal.App.4th 1426, 1444.)" (*Gorham*, *supra*, 186 Cal.App.4th at pp. 1226–1227, 1229.)

27

Code of Civil Procedure section 473, subdivision (d)." (*Id*. at p. 830, italics added; see also *Deutsche Bank National Trust Company v. Pyle* (2017) 13 Cal.App.5th 513, 526; *Lee v. An*, *supra*, 168 Cal.App.4th at pp. 563–564.)

The present case is analogous. Because SinoType was never properly served with the summons and petition, the trial court never obtained personal jurisdiction over it. The resulting judgment—whether or not void on its face—"was . . . therefore void, not merely voidable, as violating fundamental due process." (*Gorham*, *supra*, 186 Cal.App.4th at p. 1230.) It therefore could be set aside "at any time" (*People v. American Contractors Indemnity Co.*, *supra*, 33 Cal.4th at p. 660)—including, as in this case, 15 months after entry of the judgment.[10]

---

[10] Because we have found the judgment to be void, we do not address SinoType's contention that there was no binding arbitration agreement between the parties. If the parties wish to do so, they may raise this issue with the trial court in petitions to confirm/vacate the arbitration award after properly filing and serving such petitions.

## DISPOSITION

The order denying the motion to set aside the judgment is reversed. The case is remanded to the trial court with directions to vacate the judgment, vacate the order granting the petition to confirm, and quash service of the summons and petition. Appellant's motion for judicial notice, filed January 2, 2018, is granted as to exhibits 3, 4, and 5, and is otherwise denied. Appellant is awarded its appellate costs.

**CERTIFIED FOR PUBLICATION**

EDMON, P. J.

We concur:

EGERTON, J.                          DHANIDINA, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

29